UNITED STATES of America
Plaintiff–Appellee,

v.

**Felix Julian CARDONA, Defendant–Appellant.**

**No. 91–8281.**

United States Court of Appeals,
Fifth Circuit.

March 5, 1992.

Rehearing and Rehearing En Banc
Denied April 7, 1992.

Philip L. Lynch, Alfredo R. Villarreal, Asst. Federal Public Defenders, Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., for defendant-appellant.

Mark R. Stelmach, Richard L. Durbin, Jr., LeRoy M. Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before REYNALDO G. GARZA, GARWOOD and DUHÉ, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Felix Julian Cardona (Cardona) appeals his conditional plea of guilty to the offenses of conspiracy to possess more than 50 kilograms of marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 and possession of more than 50 kilograms of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The condition of Cardona's plea rested on his belief that the district court erred in denying his motion to suppress evidence of the marijuana itself. For the reasons stated below, we AFFIRM the ruling of the district court.

## I. The Facts.

A district court's purely factual findings are reviewed under the clearly erroneous standard. *United States v. Lopez*, 911 F.2d 1006, 1008 (5th Cir.1990) (*citing United States v. Muniz–Ortega*, 858 F.2d 258, 260 (5th Cir.1988)). The evidence presented at a pre-trial hearing on a motion to suppress is viewed in the light most favorable to the prevailing party. *Id.* (*citing United States v. Reed*, 882 F.2d 147, 149 (5th Cir.1989)). The conclusions of law derived from a district court's findings of fact, in this case the existence of a reasonable suspicion to stop the vehicle in which Cardona was a passenger, are reviewed *de novo*. *United States v. Harrison*, 918 F.2d 469, 473 (5th Cir.1990) (*citing United States v. Basey*, 816 F.2d 980, 988 (5th Cir.1987)). With these standards in mind, we turn to the facts of Cardona's case as adduced at the hearing on his motion to suppress.

On November 11, 1990, United States Border Patrol Agents Ferguson and Batero were sitting in their marked patrol vehicle

at the intersection of Farm to Market Route (F.M.) 334 on F.M. 3199, approximately thirteen miles northeast of Bracketville, Texas. F.M. 3199 proceeds north from its intersection with F.M. 334 to a dead end. F.M. 334, a remote road used primarily by ranchers and hunters in trucks or jeeps, is the site of many of the Border Patrol's interceptions of vehicles transporting undocumented persons. The road is known to Border Patrol agents as a convenient route used by smugglers of undocumented persons for purposes of bypassing a permanent federal checkpoint on U.S. Highway 90 near Cline, Texas. Agent Ferguson testified he had personally made six stops on F.M. 334 and, in his approximately three and one-half years as an agent, had made over 50 stops of vehicles suspected of carrying undocumented persons or contraband. Law enforcement agents in general had made between 50 and 75 stops per year on F.M. 334.

On the evening of November 11, Ferguson and Batero had been watching traffic drive by their position on F.M. 334 for roughly three hours. Approximately 90% of this traffic was comprised of deer hunters in jeeps and trucks. At 8:00 P.M., a four-door passenger vehicle approached their position and the agents turned on their headlights to illuminate it.[1] Although the automobile appeared to contain only two occupants, it rode considerably low to the ground. Ferguson and Batero decided to follow it.

As the agents followed the passenger vehicle, it slowed its speed considerably. The vehicle began to weave in the road, crossing the center line several times. This behavior, agent Ferguson testified, indicated the driver was aware he was being followed and was watching closely in his rearview mirror.

After the agents turned on their overhead lights, the agents observed a three square-inch decal over the place on the trunk of the vehicle where the lock to the trunk would normally be located. Ferguson and Batero had previously encountered decals located over trunk locks and knew such decals were often used to conceal the hole remaining after removal of the lock. The removal of trunk locks was known to the agents to facilitate the flow of air to a trunk when undocumented persons are smuggled therein or to prevent access to a trunk. Additionally, the agents knew that trunk lock removal was potentially indicative of a stolen vehicle.

The vehicle immediately pulled over. While agent Batero spoke with the vehicle's occupants, agent Ferguson was able to make radio contact[2] and discovered the vehicle was registered to a woman, Dawn Burlick of Bronte, Texas. Agent Ferguson, familiar with the region, knew the vehicle could not have been returning to that area.

Agent Batero, identifying himself as an immigration officer, questioned the two occupants of the vehicle about their citizenship. The passenger, later identified as Cardona, stated both he and the driver were pleased they had not been stopped by the Texas Department of Public Safety. The driver, later identified as Arnulfo Ruiz–Gonzales (Ruiz–Gonzales), did not make eye contact with agent Batero and when Batero directly questioned him about his citizenship, Cardona answered in his stead. After Ruiz–Gonzales did not answer agent Batero's second direct inquiry into his citizenship, agent Batero asked the question in Spanish and Ruiz–Gonzales then responded he was an American citizen. Upon further questioning in Spanish by agent Batero, Ruiz–Gonzales stated he was the owner of the vehicle and that he

---

**1.** Agent Ferguson testified that the headlights of the Border Patrol vehicle were illuminated as each vehicle passed the location where the agents were situated. He further testified that, even without the headlights illuminated, the agents' vehicle was visible to oncoming traffic in the darkness of the night from a distance of approximately two to three hundred yards, and was further identifiable as a Border Patrol ve-

hicle due to the reflective emblems on the side doors.

**2.** Agent Ferguson had previously been unable to make radio contact as the Border Patrol vehicle had been slightly out of the range of communication.

had owned it for approximately one week.[3] Throughout this period of questioning by agent Batero, agent Ferguson testified Ruiz–Gonzales appeared very nervous while Cardona appeared "too relaxed". Further, Cardona referred continually to the agents as "boss", a reference which agent Ferguson testified indicated Cardona had spent time in a penitentiary.[4]

After agent Batero observed a road map on the back seat of the vehicle and some Mexican coins strewn on the rear floorboard, he asked Ruiz–Gonzales if he would mind opening the trunk of the vehicle. Ruiz–Gonzales went to the front of the vehicle and opened the hood over the motor. When agent Batero restated that he wanted to look into the trunk, Ruiz–Gonzales walked to the rear of the vehicle. After the driver was nonresponsive to yet another request by agent Ferguson to open the trunk, agent Batero bent down and pulled the "flap"[5] of the decal partially back, looked inside, and detected the smell of marijuana.[6] The decal remained in place on the vehicle.

Agent Batero quietly related to agent Ferguson that he had detected the odor of marijuana whereupon agent Ferguson conducted a visual weapons sweep of the vehicle and as he opened the rear door, also smelled marijuana. Responding to agent Ferguson's request to look into the trunk, Ruiz–Gonzales replied the trunk was broken and he was unable to open it. When the agents asked if they could try to open the trunk, Ruiz–Gonzales said "[i]f you can". After agent Batero disengaged the trunk release in the glove compartment of the vehicle, the trunk opened easily revealing three duffel bags. Agent Ferguson smelled marijuana again and observed that one of the duffel bags was torn and marijuana residue was on the floorboard of the trunk. He also observed marijuana wrapped in cellophane inside the torn duffel bag. The trunk was later determined to contain 121 pounds of marijuana.

After Cardona and Ruiz–Gonzales were arrested and informed of their rights, Cardona asked for his jacket. Upon retrieval of the jacket, agent Batero found it contained a small bag of marijuana along with some rolling papers.[7] Agent Batero replaced the jacket, together with the marijuana found therein, in the stopped vehicle. Cardona remarked, after seeing the mari-

---

3. Agent Ferguson initially stated the two individuals had been questioned regarding the ownership of the vehicle. The testimony was as follows:

Q. What occurred next?
A. Then at this time, and the two individuals appeared very nervous to agent Batero, ... so he asked them who's car this was and the driver—he was speaking in Spanish at this time—and the driver stated that it was his and the passenger stated that it was his. And when asked how long he had had the car, the passenger said two weeks and the driver said one week.
Q. They were speaking simultaneously?
A. At different times. The passenger would interfere with the speech of the driver, *to speak for him.*
   *The Court:* Okay. Just a minute, please.
   *The questions as to who this car belonged— this was—those questions were in Spanish? To the driver?*
   *The Witness:* Yes, Sir.
   *The Court: And he responded it was his and he had it for two weeks?*
   *The Witness: He responded he had it for one week.*
   *The Court: One week. Okay. At the same time, the passenger responded two weeks.*
   *The Witness: Yes, Sir.*
From the above colloquy, it is clear Cardona, the passenger, was referring to Ruiz–Gonzales

when he indicated the car "was *his*". Agent Ferguson's testimony was unequivocal that Cardona was responding *on behalf of* Ruiz–Gonzales during the questioning by agent Batero. Beyond these statements, the record does not reflect the true ownership of the automobile with the exception of the reference to its registration to a woman in Bronte, Texas.

4. Agent Ferguson testified penitentiary inmates are instructed to refer to guards as "boss". Indeed, it was later confirmed that Cardona had in fact served time in a Texas Department of Corrections facility stemming from two convictions for aggravated sexual assault.

5. Testimony at the suppression hearing revealed the decal was not completely glued over the hole where the trunk lock had formerly been.

6. Agent Ferguson testified agent Batero was attempting to ascertain whether or not undocumented persons were in the trunk of the car. He stated:
   We usually, we were doing it for, to see if we could detect a smell of body odor because when people have been, a considerable amount of people are in a trunk, they give off a strong body odor and its easily detectable.

7. The amount of marijuana found in Cardona's jacket was described as a "user quantity".

juana removed from the jacket, that the jacket belonged to Ruiz–Gonzales. Ruiz–Gonzales later confirmed this statement by requesting the return of *his* jacket, the only jacket in the vehicle.

## II. The Law.

■ In his first point of error, Cardona contends the district court erred in concluding reasonable suspicion existed to justify pulling over the vehicle in which Cardona was a passenger. Because this case involves a roving Border Patrol stop, our analysis is guided by the principles enunciated by the United States Supreme Court in *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Under *Brignoni–Ponce*, a temporary investigative stop of a vehicle may be made by a roving patrol if the Border Patrol agents are aware of "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the vehicle is involved in illegal activities. *Brignoni–Ponce*, 422 U.S. at 884, 95 S.Ct. at 2582. "The totality of the circumstances, including the 'collective knowledge' of all officers," provides the sum of the factors to be considered by a court in assessing reasonable suspicion. *Lopez*, 911 F.2d at 1009 (*quoting Muniz–Ortega*, 858 F.2d at 260). Relevant factors include known characteristics of a particular area, previous experience of the arresting agents with criminal activity, proximity to the border, patterns of traffic, characteristics of the vehicle stopped, including its type and appearance, and finally the behavior of the driver of the vehicle. *Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2582. Although any single factor taken alone may be insufficient, under a "totality of the circumstances" analysis, the absence of a

particular factor will not control a court's conclusions. *Lopez*, 911 F.2d at 1009 (*citing United States v. Kohler*, 836 F.2d 885, 888–89 (5th Cir.1988)).

■ As we read the record of Cardona's hearing on his motion to suppress evidence, it is apparent Agents Ferguson and Batero were aware of sufficient articulable facts to form a reasonable suspicion that the vehicle in which Cardona sat as a passenger was engaged in illegal activity. The district court found there was a reasonable suspicion that the vehicle had originated its journey at the border. We have at times focused our inquiry initially on the question of whether arresting agents could reasonably conclude a particular vehicle originated its journey at the border. *See, e.g., United States v. Pacheco*, 617 F.2d 84, 86 (5th Cir.1980). Frequently, this issue is settled by an analysis of the road the vehicle was travelling on, the number of towns along the road, the number of intersecting roads and, finally, the number of miles away from the border the vehicle was at the point of the actual stop itself. *Id.* Here, the vehicle was between 40 and 50 miles from the border. The road is a rural, two-lane highway with approximately 90% of its traffic consisting of ranch trucks and hunting jeeps. The vehicle, a mid-size passenger car,[8] was travelling in an easterly direction,[9] and the towns serviced by the western direction of the road are all on or very near the border.[10] We hold that under these facts the agents had a reasonable suspicion to conclude the vehicle had originated its journey at the border.[11]

■ Having determined the agents had a reasonable suspicion to believe the vehicle originated its journey at the border, we now examine the remaining factors which

---

8. The vehicle was a 1984 or 1985 Ford Tempo.

9. The district court found the vehicle was travelling in a westerly direction. All the testimony at the hearing consistently indicated the vehicle was travelling in an easterly direction, away from the border. As such, it is clear the district court simply made a mistake in its recitation of the testimony when it made its findings of fact from the bench. We do not accord to this the seriousness Cardona does in his brief.

10. The district court stated the towns serviced by the particular road included Del Rio, Quemado, and Eagle Pass, all towns either on or within approximately five miles of the border.

11. Reasonable suspicion that a vehicle has originated its journey at the border, although "vital" to the overall analysis, is not essential, and its absence alone is not dispositive. *Pacheco*, 617 F.2d at 86.

led the district court to conclude the agents had a reasonable suspicion that the vehicle was involved in illegal activity, to wit, the transportation of undocumented persons within the borders of the United States. Testimony revealed the vehicle was riding considerably low to the ground, despite the fact that it was visibly occupied by only two persons.[12] While we have indicated this factor alone is entitled to little weight,[13] it is a permissible factor for evaluation by the district court. *United States v. Lopez–Gonzalez*, 916 F.2d 1011, 1015 (5th Cir.1990). Furthermore, the agents noticed a decal over the place where the trunk lock would normally be found. Agent Ferguson testified this indicated the trunk lock had possibly been removed to allow, *inter alia*, the free flow of air to persons concealed in the trunk. The district court found this factor very persuasive and we agree. In addition, the district court found persuasive the fact that the vehicle slowed its speed considerably and began weaving shortly after the agents began following it. According to Agent Ferguson, this indicated the driver was watching the agents in his rearview mirror.[14] Moreover, the agents were experienced in matters involving the interdiction of the illegal transportation of undocumented persons and contraband in the Texas–Mexico border area. Finally, the particular area and, specifically, the road on which the vehicle was driving, were known to the agents as areas of high criminal activity.

Viewing the totality of the circumstances, we hold the facts recited above are sufficient, though not overwhelmingly so, to permit the district court to conclude the agents had a reasonable suspicion the vehicle was engaged in illegal activity. The vehicle was reasonably suspected of coming from the border, it was riding consider-

ably low to the ground despite the fact that only two persons were visible inside it, it slowed considerably and began weaving when followed, and, significantly, it had a decal placed over the position of the trunk lock indicating the possible removal of the lock to permit the free flow of air to persons concealed in the trunk. Moreover, the agents were experienced and the area was known to the agents as an area of high criminal activity of the sort they suspected the vehicle to be engaged in. Cardona's first point of error is overruled.

In his second and third points of error, Cardona suggests respectively that the movement of the decal by Agent Batero constituted an illegal search under the Fourth Amendment and the subsequent search of the vehicle's trunk was thus illegal and the search of the trunk was illegal because the agents did not acquire consent to search.

▇ Cardona has no standing to challenge any search of the vehicle in question. The record reflects only that the automobile was registered to a non-passenger in Bronte, Texas. At best, the record reflects the vehicle belonged to Ruiz–Gonzales. Quite simply, Cardona, as a non-owning passenger, lacks standing to raise the Fourth Amendment issues he seeks to raise here. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Johnston*, 685 F.2d 934, 939 (5th Cir.), *cert. denied*, 460 U.S. 1053, 103 S.Ct. 1501, 75 L.Ed.2d 932 (1983).

Cardona asserts the United States failed to raise the issue of standing at the hearing on the motion to suppress and thus is precluded from raising the issue on appeal. He cites to a number of decisions in support of his contention. *See, e.g., United States v. Maestas*, 941 F.2d 273, 276 n. 2 (5th Cir.1991); *United States v. Amuny*,

---

**12.** Cardona argues, seemingly as a matter of law, that a vehicle with a trunk laden with 121 pounds cannot be said to be riding considerably low to the ground. We refuse to engage in the absurd guesswork Cardona invites. Cardona did not present any evidence of the integrity of the vehicle's suspension nor any evidence that even with a sound suspension the amount of marijuana seized would not cause the vehicle to appear to be riding "considerably low" to the ground.

**13.** *Pacheco*, 617 F.2d at 86 (*citing United States v. Lamas*, 608 F.2d 547, 549 (5th Cir.1979)).

**14.** Agent Ferguson additionally testified the vehicle's passengers did not look at his patrol car as it passed on the highway. Avoidance of eye contact is entitled to no weight at all. *Pacheco*, 617 F.2d at 87.

767 F.2d 1113, 1121 (5th Cir.1985); *United States v. Mendoza*, 722 F.2d 96, 97 n. 1 (5th Cir.1983); *United States v. Hultgren*, 713 F.2d 79, 83 n. 6 (5th Cir.1983); *United States v. Sanchez*, 689 F.2d 508, 509 n. 1 (5th Cir.1982). We do not question the holdings of these cases. However, Cardona, in his reply brief, asserts the United States had the opportunity to raise the issue of standing below but failed to do so. This contention disturbs us and it is the inaccuracy of the statement that leads us to conclude the United States may raise the issue for the first time on appeal.

■■■ The Supreme Court has held that where the government fails to challenge facts from which it could reasonably infer a defendant's standing, it waives the issue for purposes of appeal. *Steagald v. United States*, 451 U.S. 204, 208–11, 101 S.Ct. 1642, 1645–47, 68 L.Ed.2d 38 (1981). Generally, this court will decline to hear the issue of standing where it is raised by the government for the first time on appeal. *Amuny*, 767 F.2d at 1121. In Cardona's case, no facts were adduced at the hearing from which the government could reasonably have inferred the existence of the defendant's standing. Indeed, Cardona himself focused his efforts below on the question of the reasonableness of the stop, not the subsequent search of the trunk. Specific testimony, which remains unchallenged, established that the vehicle was registered to a woman in Bronte, Texas, and that if ownership of the vehicle rested in anyone else's hands, it rested in the hands of Ruiz–Gonzales. Given these facts, were we to accept Cardona's assertion that the government had the opportunity to raise the standing issue but failed to do so, we would be creating a rule that would require the government to raise innumerable issues despite an apparent lack of necessity to do so. Thus, we find the rule in *Steagald* inapplicable and hold the government is not barred from raising the issue of standing for the first time on appeal in this case. *See United States v. Irizarry*, 673 F.2d 554, 557 (1st Cir.1982) (government permitted to raise standing for first time on appeal where defendant failed to present facts permitting government to reasonably infer defendant had standing and government did not engage in "deliberate sandbagging" or shifting strategies). Cardona's second and third points of error are overruled.[15]

---

**15.** Even were we to find the government is precluded from raising the standing issue, we would be compelled to reject Cardona's arguments on the basis of the consent granted by Ruiz–Gonzales. Ruiz–Gonzales' consent is obvious from the record and no evidence suggesting the absence of consent is present. The agents asked if the trunk to the vehicle could be opened. After Ruiz–Gonzales opened the *hood* of the car, the agents reiterated that they would like to have the *trunk* opened. After asking Ruiz–Gonzales to open the trunk again, he indicated he couldn't. When the agents asked if they could try, he said "Go ahead". The agents then pulled the trunk release inside the vehicle and the trunk opened. As the district court found, consent clearly existed to open the trunk and once open, the marijuana was in plain view, falling out of an overstuffed duffel bag.

Cardona's argument that the agents would never have requested to see the inside of the trunk absent the actions of Agent Batero in smelling the air from under the *partially removed* decal over the removed trunk lock is without merit. The testimony of agent Ferguson indicated the officers would have made the request regardless of the fact that agent Batero smelled marijuana in the trunk. Specifically,

the uncontradicted testimony of agent Ferguson established that Ruiz–Gonzales had been asked three times to open the trunk prior to agent Batero's actions and Ruiz–Gonzales had attempted to comply at least twice, first misunderstanding the question and opening the hood, then walking to the rear of the vehicle when asked a second time to open the trunk. He simply remained silent when asked a third time to open the trunk while in the process of walking toward the trunk in response to the second request. Moreover, the agents were at all times, prior to the discovery of the marijuana, concerned with the possibility that the vehicle was being used to transport undocumented persons, particularly in the vehicle's trunk as the *partially* attached decal indicated the presence of a removed lock permitting the free flow of air to persons concealed inside. Additionally, Ruiz–Gonzales appeared very nervous upon initial questioning and Cardona appeared "too calm". The two occupants simultaneously gave conflicting responses concerning the length of time Ruiz–Gonzales had owned the car. Mexican money was observed strewn over the rear floorboard of the vehicle. Were we not to have found Cardona lacking in standing, we would nevertheless affirm.

### III. Conclusion.

Having reviewed all of Cardona's claims and having found them to be without merit, we AFFIRM the ruling of the district court.

AFFIRMED.