**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 93-7514

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

DANIEL INOCENCIO,
EVARISTO HINOJOSA, SR.,
DANIEL ALFONSO REYES,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Texas

(December 8, 1994)

Before REYNALDO G. GARZA, WIENER, and EMILIO M. GARZA, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Daniel Inocencio, Evaristo Hinojosa, Sr., and Daniel Alfonso Reyes (the "appellants") were indicted on October 20, 1992, on two separate counts. Count one consisted of conspiracy to possess with intent to distribute over five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. Count two dealt with the underlying possession offense in violation of 21 U.S.C.

§841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2.[1]

The appellants were convicted by a jury on both counts of the indictment on April 24, 1993, and were sentenced on July 22, 1993. Evaristo Hinojosa, Sr., received a concurrent imprisonment term of 300 months in the custody of the Bureau of Prisons, followed by a eight year term of supervised release, a $3,500 fine and a $100 special assessment. Daniel Inocencio received a concurrent imprisonment term of 235 months, followed by a five year term of supervised release, a $3,500 fine and a $100 special assessment. Daniel Alfonso Reyes ("Reyes") received a concurrent imprisonment term of 240 months, followed by a five year term of supervised release, a $3,500 fine and a $100 special assessment. The appellants appeal their convictions. For the reasons below, we AFFIRM the district court.

FACTS

On October 1, 1992, while conducting traffic duties at the checkpoint on Highway 16, two miles south of Hebbronville, Texas, U.S. Border Patrol Agents Carl Rhodes and Luis Del Olmo were notified at noon that directional vehicular sensors had been activated on a private ranch road on Helen Ranch between FM 3073 and Highway 359. These sensors had been installed, after numerous complaints from ranchers, to detect narcotics smugglers who

---

[1]Nicanor Inocencio and Hector Eduardo Hill were also charged as defendants in both counts. Prior to trial, however, Hill pled guilty to count two pursuant to a plea agreement with the government, whereby he agreed to testify truthfully in his co-defendants' trial. Nicanor Inocencio pled guilty to the indictment without any plea agreement from the government.

commonly used the road to circumvent two nearby Border Patrol checkpoints.[2] The sensors were strategically placed to avoid detecting routine traffic on the ranch. Agent Rhodes' unit alone had made five seizures of narcotics between April 1991 and October 1991 due to the triggering of such devices.

As Agents Rhodes and Del Olmo proceeded to the ranch, they were alerted of another sensor "hit". They also overheard on their police scanner that a tan Ford Bronco had been observed making u-turns in the area, driving up and down the highway. The agents suspected that the Bronco was a "lookout" for a second vehicle carrying contraband; the vehicle which had presumably activated the sensors. Upon reaching the ranch, the agents parked near to a locked gate that enclosed the private road and waited for a vehicle to exit.

At 12:15 p.m., they observed a white 1992 Ford pickup truck drive up to the gate from within the ranch. The truck's sole occupant, a Hispanic male, exited the vehicle and unlocked the gate. The occupant was later identified as Reyes, one of the appellants. Two other agents, Morales and Sigala, drove by as Reyes locked the gate. All four agents observed the truck depart towards Hebbronville. None of the agents recognized the truck or Reyes.

---

[2]The checkpoints are located on Highway 16, two miles south of Hebbronville, and on Highway 359 between Hebbronville and Laredo. Smugglers circumvent the checkpoints by using Highway 649 from Rio Grande City to Farm Road 3073, which exits approximately a mile below the Highway 16 checkpoint. Thereafter, the smugglers cross the private ranch road to Highway 359, thereby circumventing both checkpoints.

These agents were not only familiar with the traffic around the ranch, but they had been advised by a ranch owner that the only individuals authorized to access the road were employees of Helen Ranch, the Hughes Oil Company and the Rodriguez Service Company. The agents testified that they were familiar with the ranch employees accessing the road, that the Hughes trucks were identifiable by their company logos and that the Rodriguez truck was a white Datsun truck. The white Ford truck driven by Reyes aroused the agent's suspicions due to their unfamiliarity with the vehicle, the heightened drug activity in the area, the lack of company logos on the truck and the fact that it carried no tools or pipe racks typical of oil field trucks. The agents were also unaware of any oil activity in the area at that time. Furthermore, although Reyes appeared to be dressed as a workman, his clothing appeared too clean to have been working in the field.

The agents followed the truck onto the highway in the direction of Hebbronville. A check of the vehicle's license registration revealed that the vehicle was registered in the name of Hector Eduardo Hill of Newark, Texas. Due to their suspicions, the agents decided to stop the truck for an immigration inspection. As Agent Del Olmo questioned Reyes, Agent Rhodes noticed signs of a false compartment in the bed of the truck. The record discloses that Rhodes observed that the back of the truck was higher than normal, that Rhodes smelled fresh paint and noticed that a fresh coat of it covered dents and scratches around the fender wells at the back of the truck and that there was a fresh black undercoating

4

in certain areas underneath the bed of the truck.[3]  The parties dispute the questions asked by Del Olmo following the stop, and Reyes' behavior and responses to such questions.  In any event, Agent Rhodes ultimately asked Reyes if he consented to a canine search of the vehicle.  Reyes replied in the affirmative and a drug-sniffing dog immediately detected contraband in the bed of the truck.

Reyes was properly placed under arrest and approximately 300 pounds of cocaine (with a street value of $9,6000,000) were recovered from a false compartment in the bed of the truck.  The agents also recovered a hand-held, two-way radio from the seat of Reyes' truck, a small amount of cocaine and a key to the ranch gate.  After Reyes' arrest, the local sheriff's department was notified to be on the "look out" for the Bronco which had been driving back and forth on the highway.

At 3:18 p.m., Deputy Roland Garza, with the Jim Hogg Sheriff's Department, observed the Bronco traveling on Highway 359, one mile west of Hebbronville.  The Bronco was following too closely behind a recreational vehicle, approximately one car length behind at a speed of 55 m.p.h., prompting Deputy Garza to pull the Bronco over. Daniel Inocencio ("Daniel"), the driver, failed to produce a license and proof of insurance.  He also admitted to following the recreational vehicle too closely and apologized.  Nicanor Inocencio ("Nicanor"), the passenger, produced his Texas driver's license.

---

[3]The smell of fresh paint was suspicious to Rhodes, since the truck was brand new at the time of the stop.

5

While writing out the citations against Daniel, the deputy asked about a two-way radio located under the dashboard. Daniel admitted to owning the radio and became nervous and evasive when asked further questions about it.

After receiving Daniel's consent to search the vehicle, Deputy Garza inquired whether there were any weapons in the Bronco and Daniel indicated that there was a gun in the glove box and a clip with ammunition in the driver's side door panel. For safety reasons, the search was continued at the sheriff's department. While searching the Bronco, Deputy Garza finally realized that it matched the description of the vehicle sighted in connection with possible narcotics trafficking. Daniel was arrested for possession of a firearm, driving without a license or liability insurance and for driving too closely behind another vehicle. Nicanor was arrested for possessing approximately two grams of cocaine.

A thorough search of the Ford Bronco revealed that the two-way radio was programmed to the same frequency as the radio found in Reyes' truck. Officers also found a cellular phone that displayed a locked-in phone number of 664-7323, a piece of paper with the same phone number and number 132 written on it, and a photograph of Daniel and Reyes. The phone number was traced to Alice Motor Inn in Alice, Texas. The officers further seized a digital pager from Daniel and numerous phone numbers from his and Nicanor's wallet, including Evaristo Hinojosa's cellular phone numbers and Reyes' pager number.

Alice police officers were sent to room 132 at the Alice Motor

6

Inn.  The room was registered under the name of David Garza, but it was later determined that Nicanor had signed the registration card for the room.  The occupants of the room were identified as Hector Eduardo Hill ("Hill"), Evaristo Hinojosa, Sr., ("Hinojosa") and Alejandro Trevino.  After preliminary questioning, Hill, Hinojosa and Alejandro Trevino were transported to the Laredo Drug Enforcement Agency office.  Hill and Hinojosa were consequently arrested and charged with the present drug offenses.[4]  Reyes, Daniel and Hinojosa appeal the convictions arising from the facts above.

DISCUSSION[5]

I. Daniel Alfonso Reyes

A.

Reyes bases his appeal on three separate points of error.  In his first point of error, the appellant argues that U.S. Border Patrol agents lacked reasonable suspicion to conduct a stop and probable cause to conduct a search of the vehicle.  Reyes asserts that the Agents were predisposed to stop any traffic traveling the private road at Helen Ranch.  Consequently, Reyes argues all evidence seized from such stop is fruit from a poisonous tree.  Hence, said evidence should have been suppressed in his pre-trial

_____

[4]It is unclear from the record what charges, if any, were brought against Alejandro Trevino, nor their ultimate disposition.

[5]Although the appellants appeals are docketed under the same appeal number, each defendant has raised different issues.  Therefore, each defendant's appeal will be discussed separately.

7

motion to suppress.

A district court's purely factual findings are reviewed under the clearly erroneous standard. United States v. Cardona, 955 F.2d 976, 977 (5th Cir.), cert. denied, ---U.S.---, 113 S.Ct. 381 (1992). The evidence presented at a pre-trial hearing on a motion to suppress is viewed in the light most favorable to the prevailing party. Id. The conclusions of law derived from a district court's findings of fact, such as whether a reasonable suspicion existed to stop a vehicle, are reviewed de novo. Id.

Due to the fact that this case involves a roving Border Patrol stop, our analysis is guided by the principles enunciated by the United States Supreme Court in United States v. Brignoni-Ponce, 422 U.S. 873 (1975). Border Patrol officers on roving patrol may temporarily detain vehicles for investigation only if they are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the vehicle is involved in illegal activities. Cardona, 955 F.2d at 980 (quoting Brignoni-Ponce, 422 U.S. at 884); see United States v. Cortez, 449 U.S. 411, 421-22 (1981) (expanding the Brignoni-Ponce "reasonable suspicion" test for alien smuggling to encompass vehicle stops for any suspected criminal activity).

In determining whether a Border Patrol agent acted with reasonable suspicion, the district court may consider the following relevant factors:

> (1) known characteristics of a particular area, (2) previous experience of the arresting agents with criminal activity, (3) proximity of the area to the border, (4) usual traffic patterns of that road, (5) information about recent illegal

8

trafficking in aliens or narcotics in the area, (6) the behavior of the vehicle's driver, (7) the appearance of the vehicle, and (8) the number, appearance and behavior of the passengers.

United States v. Casteneda, 951 F.2d 44, 47 (5th Cir. 1992) (citing United States v. Melendez-Gonzalez, 727 F.2d 407, 411 (5th Cir. 1984) (in turn citing Brignoni-Ponce, 422 U.S. at 885)). Reasonable suspicion, however, is not limited to an analysis of any one factor. Melendez-Gonzalez, 727 F.2d at 411; Cardona, 955 F.2d at 980 (the absence of a particular factor will not control a court's conclusions). Instead, since "reasonable suspicion" is a fact intensive test, each case must be examined from the "totality of the circumstances known to the agent, and the agent's experience in evaluating such circumstances." Casteneda, 951 F.2d at 47.

One element that this Court frequently focuses on, however, is whether an arresting agent could reasonably conclude that a particular vehicle originated its journey at the border.[6]

---

[6]This Court considers the fact that a vehicle may have recently crossed the border as a vital element in making an investigatory stop. Melendez-Gonzalez, 727 F.2d at 411. This stems from the fact that we are reluctant to allow governmental interference with people traveling within our country, even if the vehicle is traveling close to the border. Id. That situation, however, is completely different from the instance where someone has "definitely and positively entered this country from abroad." Id. (quoting United States v. Lopez, 564 F.2d 710, 712 (5th Cir. 1977)). In the latter case, a stop at the border or its "functional equivalent" is automatically justified without a showing of probable cause or even reasonable suspicion. Id. (citing Almeida-Sanchez v. Untied States, 413 U.S. 266, 272-73 (1973)).

At times, this issue is resolved by an analysis of the road the vehicle was travelling on, the number of towns along the road, the number of intersecting roads and, finally, the number of miles the vehicle was actually from the border at the point of the stop. United States v. Cardona, 955 F.2d 976, 980 (5th Cir.), cert. denied, ---U.S.---, 113 S.Ct. 381 (1992).

<u>Melendez-Gonzalez</u>, 727 F.2d at 411 (citations omitted). When the stop occurs a substantial distance from the border,[7] this element is missing. <u>Id.</u> Since the record does not reflect the proximity of the stop to the Texas-Mexico border, this Court will take judicial notice of the fact that the stop was a substantial distance from the nearest border entry point. Consequently, the proximity element is missing in this case.

On the other hand, if the agents do not base the stop on the vehicle's proximity to the border, <u>Brignoni-Ponce</u> may still be satisfied if other articulable facts warrant reasonable suspicion. <u>United States v. Henke</u>, 775 F.2d 641, 645 (5th Cir. 1985); <u>United States v. Salazar-Martinez</u>, 710 F.2d 1087, 1088 (5th Cir. 1983) (proximity to the border is not a controlling <u>Brignoni-Ponce</u> factor if other articulable facts give rise to the requisite reasonable suspicion); <u>Melendez-Gonzalez</u>, 727 F.2d at 411. In that instance, the facts offered by the government to support a reasonable suspicion will be examined charily. <u>Salazar-Martinez</u>, 710 F.2d at 1088; <u>Henke</u>, 775 F.2d at 645.

A careful examination of the facts creates a reasonable suspicion of illegal activity, especially when the evidence is viewed in the light most favorable to the prevailing party. The record clearly establishes several of the <u>Brignoni-Ponce</u> factors.

---

[7]Vehicles traveling more than fifty miles from the border are usually a "substantial" distance from the border. <u>See</u> <u>Cardona</u>, 955 F.2d 976, 980 (5th Cir.), <u>cert.</u> <u>denied</u>, ---U.S.---, 113 S.Ct. 381 (1992) (stop was proper where vehicle was between 40 and 50 miles from Mexican border); <u>Melendez-Gonzalez</u>, 727 F.2d at 411 (a stop sixty miles from the Mexican border was not sufficient to establish that vehicle originated from the border).

For example, the record shows that Agent Rhodes was an experienced veteran who was familiar with the Hebbronville area and who had been involved in five narcotics seizures (within a five month period) on that particular road. It was certainly clear to Agent Rhodes and the other agents that this road, which was unaccessible to the public, was a main artery for drug smuggling since it circumvented the two Border Patrol checkpoints.[8]

In addition, the agents were propelled into action by sensors designed to avoid routine ranch traffic. This is not to say, however, that a sensor "hit" alone will create "reasonable suspicion" for an investigatory immigration stop. But a "hit," together with the observation of an unfamiliar and atypical-looking oil field vehicle with no company logos and an unfamiliar individual wearing clean workman's clothes may, as a whole, justify such a stop. Again, this Court will stress that the ranch owners had specifically identified the vehicles that were authorized to access the private ranch road. They emphasized that all other vehicles on that road were unauthorized. Moreover, the agents had worked that area for enough time to familiarize themselves with the employees and vehicles accessing that road.

Furthermore, the agents were alerted to the suspicious activity of the Ford Bronco in the vicinity of the ranch gate; activity suggesting a "lead car - load car" configuration.[9] The

---

[8]The record also reveals that the ranch road was heavily used by alien smugglers.

[9]This configuration is one of the tactics utilized by drug smugglers while transporting contraband. The "lead" vehicle will

11

totality of these circumstances created a sufficient level of reasonable suspicion to conduct an investigatory stop.[10]  However, contrary to appellant's argument, the facts do not support Reyes' contention that the agents were predisposed to stop and investigate any vehicle crossing that road.[11]

Since we conclude that the stop was legal, the next question we must answer is whether the seizure of the evidence was legal. Although only reasonable suspicion is needed to stop a vehicle for an immigration check, probable cause or consent is necessary in order to search a vehicle.  See United States v. Melendez-Gonzalez, 727 F.2d 407, 413 (5th Cir. 1984) (citing United States v.

_____

drive on ahead and warn the "load" vehicle, usually via two-way radio, of any law enforcement officers on the road.

[10]In light of these facts, we also agree with the government that Agents Rhodes and Del Olmo acted with an objectively reasonable good faith belief that they had a reasonable articulable suspicion that legally justified stopping Reyes.  See United States v. Ramirez-Lujan, 976 F.2d 930, 933-34 (5th Cir. 1992), cert. denied, --U.S.--, 113 S.Ct. 1587 (1993) (among the factors relied on by the Border Patrol agent in making the stop on Pinon Road were that he knew the truck did not belong to a Pinon Road resident or one of their employees, the unusual hour the truck transversed the road, the proximity of the road to an avoided checkpoint, the notoriety of the road's use for illegal activity, and its proximity to the border).  Under the good faith exception, "evidence is not to be suppressed...where it is discovered by officers in the course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they [were] authorized."  Id. at 932 (citations omitted).  The facts in Ramirez-Lujan are sufficiently similar to those before us to adequately support this finding as well.

[11]To substantiate his argument that the agents were unreasonably stopping anyone on that road, Reyes placed great weight on the fact that he possessed a key to the ranch gate  Yet, this fact by itself does not tip the scales in his favor.  If, on the other hand, he had also been driving a typical oil field truck with company logos, his argument might have carried more weight. This, however, did not occur.

Brignoni-Ponce, 422 U.S. 873, 881-82 (1975)); United States v. Henke, 775 F.2d 641, 643 (5th Cir. 1985).  The agents testified at trial that Reyes appeared nervous and offered conflicting statements in explaining his presence on Helen Ranch road.  In addition, they testified that Reyes was unable to read certain graphs and charts that he claimed he was working on while in the area.  The cumulation of the testimony and evidence above, together with the observation that the bed of the vehicle was higher than normal, the discovery of fresh paint (on a brand new truck) around the fender wells and the fresh undercoating beneath the bed of the truck, all contributed in creating a reasonable belief that the vehicle contained a false compartment.  This belief would create sufficient probable cause to search the vehicle.  See United States v. Edwards, 577 F.2d 883, 895 (5th Cir.) (en banc), cert. denied, 439 U.S. 968 (1978) ("It is well settled that probable cause to search an automobile exists when trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband.").  Even so, it is undisputed by Reyes that he voluntarily consented to a search of the vehicle after the investigatory stop.  For these reasons, we find the search legal.

B.

As his second point of error, Reyes asserts that the direct and circumstantial evidence presented against him was insufficient to support his conviction for conspiracy or possession with intent to distribute.  He argues that the government failed to prove that

13

an agreement was entered into between the five individuals originally named as defendants. Furthermore, he claims the government did not prove that he was guilty of possession with intent to distribute because it did not show that he was aware of the false compartment in the bed of the truck.

Reyes moved for a judgment of acquittal at the end of the state's evidence, but failed to renew the motion at the close of his evidence. Accordingly, our review of Reyes' claims is limited to whether his conviction resulted in a manifest miscarriage of justice. United State v. Thomas, 12 F.3d 1350, 1358 (5th Cir.), cert. denied, ---U.S.---, 114 S.Ct. 1861 (1994) (citations omitted). "Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or...because the evidence on a key element of the offense was so tenuous that a conviction would be shocking." United States v. Pierre, 958 F.2d 1304, 1310 (5th Cir.) (en banc), cert. denied, ---U.S.---, 113 S.Ct. 280 (1992) (internal quotations and citations omitted).[12] In making this determination, the evidence, as with the regular standard for review of insufficiency of evidence claims, must be considered in

_____

[12]In United States v. McCarty, No.93-7757, 1994 WL 583152, at * 9 (5th Cir. Oct. 25, 1994) (per curiam), this Court recognized that there was some question about the distinction between the plain error "miscarriage of justice" standard and the "sufficiency of the evidence" standard, see United States v. Pennington, 20 F.3d 593, 597 n.2 (5th Cir. 1994), as applied to defendants who failed to renew their motions for acquittal at the close of their evidence. This Court resolved the issue by stating that it was bound by the precedent of this Circuit as reflected in United States v. Pierre and United States v. Thomas, supra. Id. Therefore, under the plain error standard, this Court will reverse a conviction only where there is a manifest miscarriage of justice. Id.

14

the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices. Thomas, 12 F.3d at 1358-59 (citation omitted).

A conviction under 21 U.S.C. § 841 (a)(1) for possession of drugs with intent to distribute, requires the government to prove that the defendants knowingly possessed contraband with the intent to distribute it. United States v. Shabazz, 993 F.2d 431, 441 (5th Cir. 1993). Possession may be actual or constructive. Id. Ownership, dominion, or control over the contraband, or over the vehicle in which it was concealed, constitutes constructive possession. Id. Furthermore, "knowledge of the presence of contraband may ordinarily be inferred from the exercise of control over the vehicle in which it is concealed." Id. (quoting United States v. Garcia, 917 F.2d 1370, 1376-77 (5th Cir. 1990).

In recent cases, however, where the illegal substance was discovered in a hidden compartment within the vehicle, we have required circumstantial evidence that is suspicious in nature or which demonstrates guilty knowledge. Id.; see, e.g., United States v. Pineda-Ortuno, 952 F.2d 98, 102 (5th Cir.), cert. denied, ---U.S.---, 112 S.Ct. 1990 (1992); United States v. Gonzalez-Lira, 936 F.2d 184, 192 (5th Cir. 1991). For example, the defendant's control over a vehicle, when combined with his nervousness, conflicting statements, and implausible stories, is sufficient to support a finding that he had knowing possession. Pineda-Ortuno, 952 F.2d at 102; United States v. Diaz-Carreon, 915 F.2d 951, 954-55 (5th Cir. 1990). Finally, possession of cocaine in an amount

15

larger than that needed for personal consumption will support a finding that the defendant intended to distribute the drug. Pineda-Ortuno, 952 F.2d at 102; United States v. Kaufman, 858 F.2d 994, 1000 (5th Cir. 1988).

Since it is undisputed that the driver of the cocaine laden vehicle was Reyes, a jury could conclude that he had constructive possession of the cocaine. In addition, the agents' testimony revealed that Reyes seemed nervous throughout the questioning and had a hard time keeping his story straight. For instance, when questioned about the owner of the truck Reyes initially responded that it belonged to "Mr. Hill," but later reversed himself and stated that it belonged to Killam Oil. According to the agents, Reyes claimed to be reading oil field gauges in the area with the help of graphs inside the truck, but when he produced the graphs they had no marks on them. Agent Rhodes also testified that Reyes failed to explain how to read the graphs he was supposedly working on.

Reyes, on the other hand, offered a different story. Reyes testified that he had no knowledge that he was transporting cocaine when he was arrested. He alleged that a friend left the truck (with over $9.6 million in cocaine) at his house for a few hours and, since the keys were left in the ignition, decided to use it to run errands and seek employment in a ranch near to where he was stopped. Reyes denied ever giving the investigating agents the name of the vehicle's owner. Furthermore, he denied using any of the graphs found inside the truck and denied ever mentioning that

16

he knew a "Mr. Hill."

The jurors entertained the plausibility of each parties' testimony and were free to believe or disbelieve all or part of it. Yet, it is clear that they found Reyes' version of the facts implausible, since they chose to convict him. In light of the testimony and evidence adduced at trial, and by virtue of the large amount of cocaine in his possession, this Court concludes that there is an overwhelming amount of evidence in the record to support the jury's conviction for possession with the intent to distribute cocaine. Especially, when the evidence is viewed in the light most favorable to the government.

To establish a drug conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt (1) an agreement between two or more persons to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate voluntarily in the conspiracy. United States v. Pennington, 20 F.3d 593, 597 (5th Cir. 1994). "No evidence of overt conduct is required. A conspiracy agreement may be tacit, and the trier of fact may infer an agreement from circumstantial evidence." United States v. Thomas, 12 F.3d 1350, 1358 (5th Cir.), cert. denied, --- U.S.---, 114 S.Ct. 1861 (1994) (quoting United States v. Hernandez-Palacios, 838 F.2d 1346, 1348 (5th Cir. 1988)); Pierre, 958 F.2d at 1311 (a conspiracy need not be proved by direct evidence, but may be inferred from circumstantial evidence indicating a "concert of action" between the alleged conspirators). Furthermore, a jury may

17

find a defendant guilty of conspiring with unknown persons where a "pivotal figure. . .directs and organizes the illegal activity, and has extensive dealings with each of the parties." Thomas, 12 F.3d at 1357 (quoting United States v. Lockey, 945 F.2d 825, 833 (5th Cir. 1991)). Thus, "parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy," even in the absence of contact with other conspirators. Id. (quoting United States v. Richerson, 833 F.2d 1147, 1154 (5th Cir. 1987)).

Reyes argues that a conspiracy was not established because no testimony was given by co-defendants Daniel, Nicanor and Hinojosa, that there was a conspiracy between them. Furthermore, Hill, who was the main government witness, testified that he did not know Reyes. Thus, Reyes asserts that no conspiracy existed between him and any of the individuals named above. The appellant, however, fails to recognize that a conspiracy can be established through either direct or circumstantial evidence. In this case, the circumstantial evidence shows that the defendants were involved in a conspiracy to possess with the intent to distribute cocaine.

During trial, testimony was offered by the government concerning oral statements given by Daniel to agents at the Drug Enforcement Agency office.[13] The statement revealed that a friend[14]

---

[13]The record reveals the defendant was advised of his Miranda rights. He acknowledged that he understood his rights and gave the agents his statement.

[14]In testimony over Daniel's statement, Reyes was referred to as "a friend" in order to avoid the confrontation problems in Bruton v. United States, 391 U.S. 123 (1968).

18

had asked Daniel to act as a "lookout" by driving to Hebbronville in his vehicle, while his friend drove a white pickup truck. Although his friend did not disclose the purpose of the trip, he thought his friend would be transporting marihuana or an illegal substance through Hebbronville. Daniel's friend, however, never arrived at Hebbronville.

In addition, Hill offered the following testimony pursuant to a plea agreement. He testified that he traveled to Alice, Texas with Jose Alejandro Trevino to meet Hinojosa at the Alice Motor Inn. A few days prior to the meeting, he had agreed with Hinojosa to drive a load of cocaine in the white truck to a destination in Dallas, Texas. Hill disclosed that he had previously made other drug "runs" for Hinojosa. Hinojosa had instructed Hill as to the motel they were to meet at in Alice and the roads he was to take during the drug operation. When Hill arrived at the motel, he observed the Inocencio brothers leaving. Hinojosa informed him that they were going to look for the white Ford truck because it was late in arriving. Hill stated that he did not know the person who was delivering the truck, but that he knew the driver of the truck worked for Hinojosa.

From this testimony, the jury could infer the existence of a conspiracy and that Hinojosa was the pivotal figure of the agreement. They could also infer that Reyes conspired to transport the cocaine for Hinojosa. There is also additional circumstantial evidence implicating Reyes. As recited before, the radio recovered from Reyes' truck was programmed to the same frequency as the radio

19

seized from Daniel's Bronco. The radio, and the fact that the Bronco was apparently waiting for another vehicle on the highway, supports a "lead car-load car" transportation scheme. Also, among the papers seized from Daniel and Nicanor were Reyes' pager and business number, as well as Hinojosa's cellular phone number. A photograph of Reyes and Daniel was also seized from Daniel's Bronco. In addition, the cellular phone recovered from the Bronco displayed a locked-in phone number which was traced to the Alice Motor Inn. It was also established that someone using Hinojosa's cellular phone called the cellular phone in Daniel's Bronco on the morning of the offense. Again, in light of all the evidence reflected in the record, a jury could infer that a conspiracy had been formed between the defendants, and that Reyes was an active and knowing participant in the drug operation.

The conspiracy evidence recited above also establishes that Reyes aided and abetted the possession offense under 18 U.S.C. § 2. United States v. Chavez, 947 F.2d 742, 745-46 (5th Cir. 1991). The government clearly proved that Reyes "became associated with, participated in, and in some way acted to further the possession and distribution of the drugs." Id. ("typically, the same evidence will support both a conspiracy and an aiding and abetting conviction"). Thus, the evidence also supports the appellant's conviction on this offense.

## C.

As his last point of error, Reyes contests the district

court's actions in raising or enhancing his offense level for obstruction of justice.[15] He argues that there is no evidence to support a finding that his trial testimony was materially untrue since it was essentially uncontradicted by any co-conspirator's testimony at trial. He further questions the probation officer's use of Nicanor's out-of-court statement as evidence that his testimony was false.[16]

This Court is unable to entertain Reyes' contention because he has not provided this Court with a record of the sentencing hearing, and no justification has been presented for his not doing so. United States v. Hinojosa, 958 F.2d 624, 632 (5th Cir. 1992). Although the district court's judgement generally states that the basis for the sentence is "because the defendant provided an absurd version of the circumstances of the offense," it fails to reflect any further reason for increasing the offense level. Moreover, there is no record of the district court's evaluation of the defendant's trial testimony for this Court to review. Since the appellant failed to comply with the rules of appellate procedure by

---

[15]The district court may enhance the offense level by two points "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1 (1993). The commission of perjury is an example of the type of conduct that may justify the enhancement. Id. § 3C1.1 commentary n.3(b).

[16]In the Presentence Report, the probation officer recommended that Reyes' base offense level be raised for obstruction of justice for given materially false testimony at trial. The officer based his recommendation on the contradictory testimony given by law enforcement officers and Nicanor's statement implicating Reyes in the conspiracy.

failing to provide a thorough record,[17] we properly decline to review this issue.  <u>Hinojosa</u>, 958 F.2d at 632-33.

II. Daniel Inocencio

A.

Daniel asserts that the lower court has erred in denying his motion to suppress because the officer had no objectively reasonable basis to stop his vehicle.  The officer in question, Deputy Garza, stopped Daniel for following another vehicle too closely, in violation of TEX. REV. CIV. STAT. ANN. art. 6701d, § 61(a) (Vernon 1977).  Daniel argues that this statute requires a specific result to occur in the presence of the officer, i.e. a collision, before a crime can be said to have occurred.  Daniel's argument is meritless.

Article 6701d, section 61(a) of the statute defines the traffic offense for following another vehicle too closely as follows:

> The driver of a motor vehicle shall, when following another vehicle, maintain an assured clear distance between the two vehicles, exercising due regard for the speed of such vehicles, traffic upon and conditions of the street or highway, so that such motor vehicle can be safely brought to a stop without colliding with the preceding vehicle, or veering into other vehicles or objects or persons on or near the street or highway.

---

[17] "(1) Within 10 days after filing the notice of appeal the appellant shall order from the reporter a transcript of such parts of the proceedings not already on file as the appellant deems necessary, subject to local rules of the courts of appeals...(2) If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion."  FED. R. APP. P. 10(b).

22

<u>Id.</u> At the suppression hearing, Deputy Garza testified that Daniel's Bronco and the vehicle being followed were traveling close to 55 m.p.h. The deputy also testified that the Bronco was approximately one car length behind the first vehicle. For these reasons, he pulled the Bronco over. After advising Daniel of the reason for the stop, Daniel allegedly admitted to his driving closely and apologized. Daniel did not offer any evidence to contest the officer's version of the facts. The appellant also failed to produce a driver's license and proof of insurance when requested. Furthermore, Daniel also gave Deputy Garza his consent to search the Bronco and indicated that a weapon was in the glovebox after being queried about firearms. Appellant did not challenge his subsequent arrest for not carrying a driver's license or proof of insurance, nor for illegally carrying a firearm.

The Texas Court of Civil Appeals has held that an officer has probable cause, under TEX. REV. CIV. STAT. ANN. ART. 6701D, § 61(A), to stop a vehicle for following too closely. <u>Nelson v. State</u>, 827 S.W.2d 52, 54 (Tex. App. -- Houston [1st Dist.], 1992, n.w.h.). In <u>Nelson</u>, the vehicle (a motorcycle) was observed traveling within one car length of the first vehicle, prompting the officer to stop the driver. <u>Id.</u> There was no collision in that case nor was evidence presented that the driver had veered off the road. <u>Id.</u> The reviewing court upheld the denial of a motion to suppress under those facts, and concluded that the officer had probable cause to stop the defendant for following too closely and that the driver's subsequent arrest for driving while intoxicated was lawful. <u>Id.</u>

23

Because the facts relating to the stop are similar in both cases, and because we are bound by Texas precedent, we find that the trial court properly held that the stop was lawful despite the absence of a collision.  See id.; see also Texas Highway Dep't. v. Broussard, 615 S.W.2d 326, 329-30 (Tex. Civ. App. -- Fort Worth 1981, writ ref'd n.r.e.) (under art. 6701d, § 61, it is the duty of anyone operating a vehicle upon the public highways to maintain such a clear distance behind the preceding vehicle so that, should the necessity arise, he will be able to slow down or even stop without colliding with the preceding vehicle; the driver is guilty of negligence under the statute if the driver fails to maintain such distance, whether or not there is a collision).  Therefore, any evidence or statements taken as a result of the stop are also lawful.

## B.

In addition, Daniel claims that article 6701d, § 61(a) is unconstitutionally vague because it does not provide a person with adequate notice of the prohibited activity.  Therefore, the argument continues, it can not provide an officer with a reasonable objective basis for the traffic stop and thus, the evidence and statements taken as a result should have been suppressed by the trial court.  This argument also lacks merit.  We are unconvinced that the statute is vague in any sense.  Yet, even if the statute were declared unconstitutional, it would not affect the legality of the stop since Deputy Garza had probable cause to believe Daniel violated the "presumptively valid" statute.  See Michigan v.

24

DeFillippo, 443 U.S. 31, 37-40 (1979) ("A prudent officer, in the course of determining whether respondent had committed an offense..., should not have been required to anticipate that a court would later hold the ordinance unconstitutional.");[18] accord United States v. Landry, 903 F.2d 334, 339 (5th Cir. 1990). The denial of the motion to suppress was proper.


III. Evaristo Hinojosa, Sr.

A.

Hinojosa claims on appeal that the district court committed plain error in giving the jury charge by making several comments which relieved the government's burden of proving all the elements of its case. First, Hinojosa argues that the district judge effectively directed the jury to find that the substance seized by agents was in fact cocaine.[19] He asserts that a stipulation entered into with the government, merely reflected that a chemist would have given testimony at trial that the test sample tested positive

---

[18]The Supreme Court added that the "purpose of the exclusionary rule is to deter unlawful police action. No conceivable purpose of deterrence would be served by suppressing evidence which, at the time it was found on the person of the respondent, was the product of a lawful arrest and a lawful search. To deter police from enforcing a presumptively valid statute was never remotely in the contemplation of even the most zealous advocate of the exclusionary rule." DeFillippo, 443 U.S. at 38 n.3.

[19]For example, the court instructed the jury that "[t]he crime of possession with intent to distribute cocaine involves these elements. Number one, to tailor it to the facts of this case, that the substance in that white pick-up truck was, in fact, cocaine... And incidently, that's not really a matter of dispute. I think there's a chemist report in here that everybody has signed off on and agreed that, in fact, that's true."

25

for cocaine and that it was taken from a three hundred pound "catch."  This, however, was not conclusive proof that the substance was cocaine.  Thus, Hinojosa claims the judge erred in failing to inform the jury that they could reject the stipulated testimony and determine, in the alternative, that the substance was not in fact cocaine.

The record reveals that no objections were made to the court's charge during trial.  In such a case, this Court will uphold the charge absent plain error.  United States v. Davis, 19 F.3d 166, 169 (5th Cir. 1994) ("When no party objects at trial to a jury instruction, we will uphold the charge absent plain error.").  Plain error occurs only when the instruction, considered as a whole, was so clearly erroneous as to result in the likelihood of a grave miscarriage of justice.  Id.  With this standard in mind, we review the court's jury instructions.

While the trial court may under no circumstances withdraw any element of an offense from the jury's consideration in a criminal case, the judge may comment on the evidence, so long as he instructs the jury that they are not bound by his comments.  United States v. Canales, 744 F.2d 413, 434 (5th Cir. 1984).  A trial judges's comments may also be error if they "seriously prejudice the defendant."  Id.

Hinojosa has turned a blind eye to the relevant section of the stipulations entered into by the parties.  That section reads as follows:

> It is further stipulated and agreed between the United States of America and Defendants DANIEL INOCENCIO, NICANOR INOCENCIO,

26

EVARISTO HINOJOSA, SR., and DANIEL ALFONSO REYES and their attorneys of record, Jose Luis Ramos, Enrique A. Garza, Eustorgio Perez, and Ruben Garcia, respectively, <u>that the results of the chemical analysis of Government Exhibits #1</u>, #2, and #3 performed by Angela M. DeTulleo, Forensic Chemist, Drug Enforcement Administration, <u>revealed that the substance was in fact Cocaine (Cocaine HCL)</u>.

Government Exhibit 1A at 1-2 (emphasis added). The stipulation also stated that the chain of custody for Exhibit #1, which evidenced the 127 bundles of cocaine taken from the Ford truck, was unbroken. <u>Id.</u> at 2-3. Whether or not the substance was cocaine was not a disputed issue, instead, it was stipulated to as fact. A judge may point out undisputed facts to the jury without error. Moreover, the record clearly shows that the judge's comments were to be advisory and non-binding, and furthermore, that the jurors were to be the ultimate fact finders.[20] We cannot say that the trial court's references to "cocaine" prejudiced the appellant in any way.[21] In this respect, the judges comments were proper.

_____

[20]For example, the judge stated "I am the judge of the law and you're the judges of the facts... I also remind you again that whatever I have said or done here during the trial, and I'm talking about me personally, is because I -- was following the law and procedures that I thought were important or basically trying to keep order or move the case along. Or to the extent that I would ever ask questions of a witness, that was to bring out things that I thought were incomplete or confusing so that you could have more facts to base your decision. But please do not speculate or infer or conclude as to what opinion you think that I have about the case. Your function is not to guess what I would do if I were a juror. Your function is to make your own judgment about the outcome of this case." In testing the credibility of the witnesses, the jury was told "you, and you alone, are the only ones that can decide who you believe and how much you believe them."

[21]The record reflects that appellant's own counsel referred to the substance as cocaine in his closing argument - "...I ask you to look at that cocaine when you go in and deliberate. Look at it. It's a lot of cocaine..."

Hinojosa also challenges the court's instructions regarding the government's burden in proving an "intent to distribute" and a conspiracy.  The first instruction was as follows:

> And as was correctly said to you yesterday, [intent to distribute is] something that can be decided also by circumstances.  The sheer volume of it, three hundred pounds.  The way it was packaged.  The circumstances of how it was being carried in a vehicle on the highway.  And, of course, <u>Mr. Hill's testimony, to the extent that you believe this part, and I don't -- at least I don't think anybody's challenging him on this part</u>.  I mean, whoever else was involved, he says that when the truck arrived at Alice, he himself was going to take it and distribute it.  That he was going to take it and pass it on to somebody up in the Fort Worth/Dallas area.
> Well, that's exactly what intent to distribute means.  That the purpose of having that cocaine in somebody's possession was to distribute it to other people.  So Hill says, <u>if you accept his testimony</u>, that that's what the purpose was.

Hinojosa claims that this instruction gave credence to Hill's testimony by stating that such testimony was uncontested.  As recited above, a judge may comment on the evidence to facilitate the jurors' task of reaching a proper verdict so long as the judge advises them that they are not bound by his comments.  The remarks above simply reflected the evidence in the record.  The judge did not instruct the jury to take Hill's testimony as true, he merely suggested that they could believe or disbelieve the testimony in considering whether there was intent to distribute.  Moreover, the jury was instructed that the fact that Hill had admitted his guilt did not establish the guilt of anyone else in the case.

Regarding the second instruction, appellant challenges the court's comments in defining the elements of a conspiracy.  The

court told the jury:

> Because a conspiracy is simply an agreement, an agreement of the type, for example, -- and lets forget for a minute who all is involved. But of the type that Hill is describing, an agreement to get a truck, arrange for a driver, meet and move the truck from one spot to another spot and deliver the cocaine and so forth. That would be a conspiracy. That would be a classic agreement situation where a group of people have reached an understanding that they're going to do something illegal. They're going to get possession of cocaine with the intention of distributing it to other people. So that would be a classic conspiracy to possess cocaine with intent to distribute it.
>
> So nobody here is arguing, as I get it, that there was not that kind of conspiracy going on. I think everybody joins in and says, yeah, there probably was that kind of conspiracy going on. It's a big amount, it's a big load, it's a valuable load. It was in the truck and there were people in a hotel and it was going other places and so forth. So there is probably a conspiracy going on.

Hinojosa claims that this instruction relieved the government of its burden of proving that a conspiracy occurred between Hinojosa and the other defendants. In addition, by accepting that there was "probably a conspiracy going on," the court allegedly reflected its bias in favor of the government.

We are also unpersuaded by this argument. In the first paragraph of the instruction, the district court merely described an agreement in terms of the facts before the jury. The judge never instructed the jury that the evidence showed that the defendants were involved in a conspiracy. The court also gave additional instructions beyond that statement in which he cited several other factual examples of a conspiracy and concluded with the statement that the government had to prove beyond a reasonable doubt that each of the defendants was intentionally involved in the criminal plan. More importantly, immediately before giving this

29

instruction, the court stressed that it was within the jury's province to determine who was involved in the conspiracy with Hill:

> In other words, by Hill's scenario -- and I'm not telling -- I'm not endorsing -- please understand this. <u>When I quote evidence, I'm not saying for you to believe it or not believe it. I'm just trying to illustrate to you and then it's up to you to believe it or not believe it</u>. But I'm saying that by Hill's scenario, it would be he -- he would be involved 'cause he was going to take it to Dallas; Hinojosa would be involved cause Hinojosa was there, making the arrangements and so forth; the two Inocencios were lookouts of some kind, guides; Reyes was the truck driver; a fellow named Tenorio had some role in it.
> So there may be lots of people, <u>but the question for you to decide is, are these people involved.</u> Because, of course, their version, as you've heard argued, is that they did not know what was going on. That, yes, indeed, it may be Hill, it may be Tenorio, it may be Trevino, and it may be people in Fort Worth and Dallas, but not them. They are not involved in the conspiracy. <u>And that's for you to decide.</u> That's the question of count one.

Based on the precautionary instructions given by the lower court, we find no error in this part of the charge.

Regarding the second paragraph of the instruction, the district court's remarks again reflected the evidence in the record. The court simply referred to the same evidence that Hinojosa's counsel relied on in his own closing argument.[22] Since the remarks mirrored Hinojosa's own defense theories, this Court cannot conclude that plain error was committed.

CONCLUSION

Having determined that none of appellants' complaints present

_____

[22]In his closing argument, Hinojosa's attorney argued that he "believe[d] that the government proved a conspiracy in this case to conspire with intent to distribute cocaine." However, he argued to the jury that the government had proved a conspiracy between the other defendants, not his client.

reversible error, the judgment of the district court is affirmed.

AFFIRMED.