**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 95-50460**
_____


**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**CHRISTIAN DAVID TAMEZ-GONZALEZ**
**and**
**ISRAEL RODRIGUEZ-MURGUIA,**

**Defendants-Appellants.**

_____

**Appeal from the United States District Court**
**for the Western District of Texas**
**(DR-95-CR-3)**
_____

November 26, 1996

Before BARKSDALE, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Christian David Tamez-Gonzalez and Israel Rodriguez-Murguia appeal their convictions, following a jury trial, for importation of marijuana, possession of marijuana with intent to distribute, and conspiracy to commit those offenses.  We **AFFIRM**.

I.

---

[*]    Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

On January 9, 1995, at approximately 1:00 a.m., Rafael Gomez, a Border Patrol Agent, observed Tamez-Gonzalez driving a maroon GMC pickup truck on Garza Road near the Mexican border, an area known for alien and narcotics smuggling.  Agent Gomez determined that the truck was owned by Jorge Ramon, a fugitive wanted for drug crimes, and stopped it.

Tamez-Gonzalez explained that he had borrowed the truck and was taking his girlfriend home.  After Gomez found a police scanner underneath the passenger seat and a two-way Motorola radio under the driver's seat, Tamez-Gonzalez said that he owned the radio and worked as a salesman for Motorola.  Gomez allowed Tamez-Gonzalez to leave, but advised other Border Patrol units to be on the lookout for that truck and others for possible narcotics smuggling.

Approximately an hour later, Border Patrol Agent Gilberto Lopez saw Tamez-Gonzalez driving a white Dodge Ram Charger, again on Garza Road.  Lopez observed an automobile following 200 to 300 yards behind it, swerving, and he pulled the automobile over. Bundles of marijuana weighing approximately 100 kilograms were found in the back seat and a Motorola two-way radio was found under the front seat; Jose Felix Garcia was the driver; and Rodriguez-Murguia, wet and sweaty, was the only passenger.

Pursuing a tip from Garcia, Gomez found the above mentioned Ram Charger parked in front of Garcia's house.  Tamez-Gonzalez, who was sitting in the driver's seat, explained that he was at the

house for a party and was about to take his girlfriend home. A wet, barefooted illegal alien was in the back seat of the truck, and two more, wet and muddy, were inside the house.

The earlier referenced GMC truck was parked in the driveway. Tamez-Gonzalez said that he had switched trucks because he left his keys inside the house and did not want to bother Mrs. Garcia.

The Ram Charger contained a cellular telephone and a base radio that could be used with the Motorola two-way radios. When shown the radio found in Garcia's car, Tamez-Gonzalez said that it looked like his; when told where the radio had been found, he denied owning it.

Garcia pleaded guilty and agreed to testify against his co-defendants. The Government prosecuted Tamez-Gonzalez and Rodriguez-Murguia for importation of marijuana, possession of marijuana with intent to distribute, and conspiracy to commit those offenses. Garcia testified at their trial that he met with Tamez-Gonzalez at the Coco Loco Bar in Cuidad Acuña, Mexico, to discuss a plan whereby Mexicans would cross the border and give bundles to Tamez-Gonzalez, and Garcia then would drive the smugglers back to Mexico. They successfully executed this scheme twice before they were caught, each time meeting smugglers along Garza Road.

Garcia testified that he had a birthday party for his wife on the night in question. Tamez-Gonzalez attended the party and offered Garcia $500 to go with him to "pick up some guys". Garcia

agreed and followed Tamez-Gonzalez to a spot on Garza Road. Tamez-Gonzalez had given Garcia a two-way radio to allow them to communicate, and flashed his lights to indicate where Garcia was to stop. When Garcia stopped, Rodriguez-Murguia entered his vehicle. Garcia, who had never seen Rodriguez-Murguia before, asked where the other people were; Rodriguez-Murguia responded that they were coming. Other individuals threw bundles of marijuana into the automobile's back seat and ran away. Rodriguez-Murguia then said "let's go, let's go", and Garcia drove away.

Tamez-Gonzalez's testimony directly contradicted Garcia's. Tamez-Gonzalez claimed that he went to Garcia's house because Ramon (the above referenced fugitive), a frequent customer of Tamez-Gonzalez's taco stand, invited him to the party; that he drove Ramon's truck at his request; and that he never discussed smuggling or picking up people with Garcia.

Rodriguez-Murguia did not testify. His attorney contended in his opening statement and in closing argument that Rodriquez-Murguia did not even know his co-defendants and had never agreed with anyone to smuggle drugs. A jury convicted both defendants on all counts.

## II.

Three issues are presented: the admission of statements Tamez-Gonzales made to a narcotics agent; the denial of Rodriguez-Murguia's motion for a mistrial; and the sufficiency of the

- 4 -

evidence.

A.

Tamez-Gonzalez asserts that statements he made to Don Letsinger, an Agent of the Texas narcotics control program, are inadmissible because he made them in the course of plea negotiations with the Government. *See* FED. R. CRIM. P. 11(e)(6); FED. R. EVID. 410.

Tamez-Gonzalez testified that he had no knowledge of marijuana smuggling, or of a person named Angel, or what his customers did with the radios he sold them. Over Tamez-Gonzalez's objection, which the district court overruled, Letsinger testified on rebuttal that Tamez-Gonzalez told him that (1) the seized marijuana was intended for an individual named Angel whom he had met at Pancho's bar in Acuña; (2) he knew that his customers used the radios when transporting marijuana; and (3) he knew specific radio frequencies used by marijuana smugglers to avoid detection. Before making the statement to Letsinger, Tamez-Gonzalez signed an agreement providing that his statement could "be used for impeachment purposes if the Defendant testifies in any way that is inconsistent with the debriefing statement."

Tamez-Gonzalez contends that Rules 11(e)(6) and 410 are not subject to waiver because they represent a policy decision that the Government should not use statements made in conjunction with plea negotiations. To the contrary, "[a]bsent some affirmative

indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." ***United States v. Mezzanatto***, ___ U.S. ___, 115 S. Ct. 797, 806 (1995).

Tamez-Gonzalez does not claim that he entered into the agreement unknowingly or involuntarily. Thus, his waiver is valid. (Accordingly, we need not reach the Government's contention that Tamez-Gonzalez did not make the statements as part of a plea negotiation.)

## B.

Rodriguez-Murguia challenges the denial of his motion for a mistrial, based on the Government's failure to disclose, pursuant to a discovery request, oral statements he made to a Government Agent. Agent Letsinger testified that Rodriguez-Murguia told him that he was a waiter at the Coco Loco restaurant. This testimony, combined with Garcia's testimony that he met with Tamez-Gonzalez at the Coco Loco to discuss details of their conspiracy, undercut Rodriguez-Murguia's contention that he did not know the other conspirators.

Rodriguez-Murguia's counsel objected, contending that Letsinger's testimony was covered by a discovery order requiring the Government to produce all statements made by Rodriguez-Murguia in response to Government interrogation, and that the Government had not disclosed that statement. The Government responded that

Rodriguez-Murguia made the statement in response to a routine question in the context of booking information, and that its failure to disclose the response was an oversight.

The district court denied the motion, stating that it thought the failure was unintentional. Rodriguez-Murguia initially requested a curative instruction, but withdrew that request.

If a party fails to comply with a discovery order, the district court "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." FED. R. CRIM. P. 16(d)(2). As the language of the rule indicates, the district court has "broad discretion" in responding to discovery abuses. *United States v. Bentley*, 875 F.2d 1114, 1118 (5th Cir. 1989). "In exercising this discretion, the district court should consider factors such as the reasons why disclosure was not made, the prejudice to the opposing party, the feasibility of rectifying that prejudice by granting a continuance, and other relevant circumstances." *Id.*

Granting a mistrial is a disfavored remedy for discovery violations. The district court "should impose the least severe sanction that will accomplish the desired result". *Id.* (quoting *United States v. Sarcinelli*, 667 F.2d 5, 7 (5th Cir. 1982)). Even in a case involving disclosure of evidence on the night before

- 7 -

trial, our court affirmed the decision not to exclude the evidence, noting that exclusion is "the most extreme sanction possible." *Id.* As our sister circuit noted, however, exclusion is really only "the most severe remedy a court can impose *short of declaring a mistrial.*" **United States v. Rodriguez**, 765 F.2d 1546, 1557 (11th Cir. 1985) (emphasis added). Because of their severity, mistrials are reserved for extreme instances. In fact, they are not included in Rule 16(d)(2)'s list of suggested remedies.

In short, Rodriguez-Murguia must show that the district court abused its broad discretion by declining to employ a disfavored remedy. He has not done so. For starters, he does not even contest the district court's finding that the non-disclosure was unintentional.

Second, Rodriguez-Murguia has not made a specific showing that the tardiness of the disclosure prejudiced him. This is not a case where the Government used the statement on cross-examination to damage, immediately and irreparably, the credibility of a defense witness. Instead, the only individual with first-hand knowledge of the statement revealed it during the Government's case-in-chief. If defense counsel needed additional time to prepare for cross-examination of Letsinger, find a rebuttal witness, or refine his own case, he could have requested a continuance, or at least moved to strike the testimony.

Finally, Rodriguez-Murguia asserts conclusorily that knowledge

of the evidence would have been material to the preparation of his defense. Such an assertion is undoubtedly true in *all* Rule 16(d) cases; all of the available evidence should be considered in preparing for trial. But, Rodriguez-Murguia has not shown that he would have employed a different overall trial strategy if the Government had disclosed the statement; nor is an alternative strategy apparent from the record. Rodriguez-Murguia has also failed to identify any unusual circumstances requiring the drastic remedy of a mistrial. Accordingly, the district court did not abuse its broad discretion by denying the motion. (Therefore, we need not reach the Government's contention that the discovery request did not encompass statements made during booking.)

### C.

Tamez-Gonzalez and Rodriguez-Murguia challenge the sufficiency of the evidence to support their convictions. The elements of a drug conspiracy are (1) an agreement between two or more people to violate the law; (2) knowledge of the agreement; and (3) voluntary participation in the conspiracy. *E.g.,* **United States v. Casilla,** 20 F.3d 600, 603 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 240, *and cert. denied*, ___ U.S. ___, 115 S. Ct. 255, *and cert. denied*, ___ U.S. ___, 115 S. Ct. 361 (1994). Circumstantial evidence showing a "concert of action" may suffice to prove the existence of a conspiracy. *Id.* A jury also may infer a defendant's knowledge and voluntary participation from a

"collection of circumstances" and may rely upon his presence and association with other members of the conspiracy, along with other evidence, in finding that he joined the conspiracy. *Id.*

To prove importation of a controlled substance, the Government must show that the defendant (1) played a role in bringing the substance into this country; (2) knew that the substance was a controlled one; and (3) knew that the substance would enter the United States. *Id.* And, the elements of possession with intent to distribute are (1) possession; (2) knowledge; and (3) intent to distribute. Possession may be actual or constructive, and "[i]ntent to distribute may be inferred from the value and quantity of the substance possessed." *Id.*

### 1.

Tamez-Gonzalez moved for judgment of acquittal at the close of the Government's case but failed to renew the motion after presenting his own case. Accordingly, we will review the evidence only to determine whether Tamez-Gonzalez's conviction resulted in a manifest miscarriage of justice. *See* **United States v. Inocencio**, 40 F.3d 716, 724 (5th Cir. 1994). "Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or ... because the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *Id.* (quoting **United States v. Pierre**, 958 F.2d 1304, 1310 (5th Cir.) (en banc), *cert. denied*, 506 U.S. 898 (1992)).

Tamez-Gonzalez contends that the evidence shows only that he conspired to "pick up some guys", not to commit drug offenses. Letsinger testified that Tamez-Gonzalez admitted that he knew that the marijuana was destined for a man named Angel, whom Tamez-Gonzalez had met previously. In addition, Garcia testified that he and Tamez-Gonzalez twice before had picked up illegal aliens bearing bundles on Garza Road. Thus, the record is not "devoid" of evidence pointing toward Tamez-Gonzalez's knowledge of the ends of the conspiracy.

Tamez-Gonzalez asserts that some of Garcia's testimony was untrue and that his own testimony is more credible than Garcia's. Of course, as an appellate court, we must accept a jury's credibility determinations unless the witness' testimony is "factually impossible." *See* **United States v. Lopez**, 74 F.3d 575, 578 (5th Cir.) (internal quotation marks and citation omitted), *cert. denied*, ___ U.S. ___, 116 S. Ct. 1867 (1996). Garcia's testimony is at least plausible; thus, we cannot disturb the jury's assessment of his credibility.

Finally, Tamez-Gonzalez insists that there is no evidence that he ever physically possessed marijuana or exercised dominion over it. The district court correctly instructed the jury that it could find Tamez-Gonzalez liable for reasonably foreseeable acts that his co-conspirators committed in furtherance of the conspiracy. *See* **United States v. Leahy**, 82 F.3d 624, 634 (5th Cir. 1996); **Pinkerton**

*v. United States*, 328 U.S. 640, 645-48 (1946).  Possession of marijuana was certainly a foreseeable act in furtherance of the conspiracy.

2.

As did his co-defendant, Rodriguez-Murguia moved for acquittal at the close of the Government's case but did not renew his motion at the close of all the evidence.  But, because Rodriguez-Murguia did not present evidence in his own defense, he was not required to renew his motion.  *See United States v. Arias-Diaz*, 497 F.2d 165, 168-69 (5th Cir. 1974), *cert. denied*, 420 U.S. 1003 (1975); 2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 463, at 642 (1982).

Thus, we must determine whether any rational juror could have found that the evidence established Rodriguez-Murguia's guilt beyond a reasonable doubt.  *See Casilla*, 20 F.3d at 602.  It goes without saying that, because the jury bears sole responsibility for determining weight and credibility, we draw all reasonable inferences in favor of the verdict.  *Id*.

There was sufficient evidence from which the jury could reasonably infer that Rodriguez-Murguia was a knowing and voluntary participant in the drug conspiracy.  He was a waiter at the Coco Loco restaurant, where Garcia and Tamez-Gonzalez met to discuss the details of the conspiracy.  He was waiting at the place along Garza Road where Tamez-Gonzalez and Garcia stopped to meet the drug smugglers.  He promptly entered Garcia's automobile, and when

Garcia asked where the others were, Rodriguez-Murguia responded that they were coming. After the other aliens put the bundles of marijuana in Garcia's automobile, Rodriguez-Murguia remained in it and said, "let's go, let's go." When he was arrested, Rodriguez-Murguia was wet and sweaty and confessed to having entered the country illegally.

This evidence shows far more than "mere presence" at the crime scene. Rodriguez-Murguia's appearance indicated that he had just crossed the border illegally, and his actions indicated that he was working with the smugglers: He was waiting at the meeting site, entered the drop-off vehicle, told the driver the others were coming, and said "let's go" after the marijuana had been delivered. Rodriguez-Murguia was not merely present -- he also engaged in a "concert of action" showing that he was a member of the conspiracy.

There was also sufficient evidence to convict Rodriguez-Murguia on the substantive counts. As discussed above, the district court gave the jury a *Pinkerton* instruction, pursuant to which it found Rodriguez-Murguia liable for the reasonably foreseeable acts of his co-conspirators in furtherance of the conspiracy.

### III.

For the foregoing reasons, the judgments are

*AFFIRMED*.