REVISED, June 22, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 97-40843

UNITED STATES of America,

Plaintiff-Appellee,

VERSUS

Robert Dale NICHOLS,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

May 29, 1998

Before POLITZ, Chief Judge, REYNALDO G. GARZA, and DENNIS, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Robert Dale Nichols pleaded guilty, under a conditional plea, to one count of possession with intent to distribute in excess of 100 kilograms of marijuana. Prior to that plea, the district court had denied Nichols' motion to suppress the marijuana and Nichols' statements while in custody, holding that the Border Patrol had reasonable suspicion to stop Nichols' automobile, "based on sufficient articulable facts." The district court also held, in the alternative, that the border patrol agents had an "objectively reasonable good faith belief that they had sufficient basis to make the stop."

Nichols argues on appeal that the district court erred in denying his motion to suppress any evidence or statements that the Border Patrol obtained while detaining and holding him in custody. Nichols argues that the Border Patrol agents did not have reasonable suspicion to stop his vehicle, but does not challenge the ensuing search of his vehicle, which revealed the marijuana.

1

Nichols further asserts that the district court erred in its alternative holding, arguing that the "good faith" exception to the exclusionary rule does not apply to reasonable suspicion determinations.

We find below that, based on sufficiently articulable facts, the totality of the circumstances surrounding the Border Patrol's stop of Nichols' vehicle satisfied the constitutional requirement of reasonable suspicion.[1] We begin by discussing the Supreme Court decision establishing the reasonable suspicion standard for roving Border Patrol investigatory stops. We also briefly examine the important public interest justifying a departure from the probable cause requirement of the Fourth Amendment in such circumstances, as well as the recent application of the reasonable suspicion standard in this circuit. This opinion next sets forth the facts of the present case, and then examines those facts in light of the reasonable suspicion standard. Due to the presence of several factors supporting the reasonableness of the Border Patrol agents' suspicion in this case, we conclude that, based on the totality of the circumstances, there were sufficient articulable facts to support the Border Patrol's reasonable suspicion that Nichols was engaged in

[1] As we find this to be a case of reasonable suspicion, we need not address the district court's alternative holding, except to clarify that the Fifth Circuit has recognized the applicability of the good faith exception to reasonable suspicion determinations. *See United States v. Inocencio*, 40 F.3d 716, 723 n.10 (5th Cir. 1994) ("[W]e also agree with the government that [the agents] acted with an objectively reasonable good faith belief that they had a reasonable articulable suspicion that legally justified stopping the defendant."); *United States v. Ramirez-Lujan*, 976 F.2d 930, 934 & n.7 (5th Cir. 1992) ("We hold that, under all the circumstances, agent Coleman acted with an objectively reasonable good faith belief that he had a reasonable articulable suspicion that legally justified stopping Ramirez on Pinon Road."), *cert. denied*, 507 U.S. 987 (1993); *United States v. De Leon-Reyna*, 930 F.2d 396, 399-401 (5th Cir. 1991) (*en banc*) (applying good faith exception where agent relied on incorrect information from other agents). We note, however, that, in contrast to the present case, the situation justifying application of the good faith exception to reasonable suspicion determinations has always involved circumstances extrinsic to the government agent's personal observations at the time of the stop. *See Inocencio*, 40 F.3d at 723 (local ranchers had identified all vehicles authorized to access private ranch road, which did not include defendant's vehicle, and sensors alerted agents to presence of non-routine ranch traffic); *Ramirez-Lujan*, 976 F.2d at 933-34 (agent knew that truck did not belong to a resident of the road in question or one of their employees); *see also, e.g., Arizona v. Evans*, 514 U.S. 1, 14 (1995) (holding that evidence seized in violation of Fourth Amendment as result of clerical errors of court employees, causing incorrect computer records, fell within good faith exception to exclusionary rule); *United States v. Garcia*, 942 F.2d 873, 876 (5th Cir. 1991) (holding that border patrol agents' reliance on erroneous information from dispatcher justified application of good faith exception), *cert. denied*, 502 U.S. 1080 (1992).

criminal activity. As such, we find no violation of the Fourth Amendment, and we affirm the district court's denial of Nichols' motion to suppress.

## I.      Background

### A.      *The Fourth Amendment and Roving Border Patrol Stops*

The Supreme Court addressed the Border Patrol's authority to stop automobiles near the Mexican border in *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), finding that such authority exists only where Border Patrol agents "are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884. Specifically, *Brignoni-Ponce* required the Court to address whether roving Border Patrol agents may stop a vehicle near the Mexican border where the only ground for suspicion is that the vehicle's occupants appear to be of Mexican ancestry. *Id.* at 876. The Court held that the mere appearance of Mexican ancestry did not alone amount to the reasonable suspicion necessary for a roving Border Patrol stop near the border. *Id.* at 886-87.

The Court began by noting that the Fourth Amendment applies to all seizures of the person, including seizures involving only a brief detention short of traditional arrest. *Id.* at 878 (citing, e.g., *Terry v. Ohio*, 392 U.S. 1 (1968)). Quoting from the seminal *Terry* decision, the Court explained that a police officer's restraint of an individual's freedom to walk away constitutes a seizure, for which the Fourth Amendment imposes a reasonableness requirement. *Id.* The reasonableness of such a seizure, as the Court pointed out, "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.*

The Court then examined the interests at stake, finding that "[b]ecause of the limited nature of the intrusion, stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *Id.* at 880. In reaching this conclusion, the Court examined the public interest in effective prevention of illegal entry of aliens at the Mexican border,

which creates "significant economic and social problems." *Id.* at 878-79. Against this valid public interest, the Court weighed the interference with individual liberty that results when an officer stops an automobile and questions its occupants, finding this intrusion to be "modest." *Id.* at 879. The Court concluded:

> [B]ecause of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in Terry, the stop and inquiry must be "reasonably related in scope to the justification for their initiation."

*Id.* at 881.

The Court elaborated by noting that the reasonableness requirement allows the government "adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference." *Id.* at 883. As such, the Court found that, even though the intrusion on personal liberty by roving Border Patrol agents is modest, "it is not 'reasonable' under the Fourth Amendment to make such stops on a random basis." *Id.* Finally, although holding that the apparent Mexican ancestry of the vehicle's occupants was one of several factors that legitimately inform the reasonable suspicion analysis, the Court nonetheless found that "standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." *Id.* at 887.

**B.** ***The Valid Public Interest Underlying the Reasonable Suspicion Standard***

In *Brignoni-Ponce*, the Supreme Court noted the important public interest in effective prevention of the illegal entry of aliens at the Mexican border:

> Estimates of the number of illegal immigrants in the United States vary widely. . . . Whatever the number, these aliens create significant economic and social problems, competing with citizens and legal resident aliens for jobs, and generating extra demand for social services. The aliens themselves are vulnerable to exploitation because they cannot complain of substandard working conditions without risking deportation.

422 U.S. at 878. These concerns are no less pressing today. The United States Immigration and Naturalization Service ("INS") estimates that in October 1996, there were about 5 million

undocumented immigrants residing in the United States. *INS Statistics: Illegal Alien Resident Population* (last modified Nov. 25, 1997) <http://www.ins.usdoj.gov/stats/illegalalien> (summarized in William Branigin, *Illegal Immigrant Population Grows to 5 Million*, WASH. POST, Feb. 8, 1997, at A3). The undocumented immigrant population grew by an estimated 275,000 annually from 1992-96. *Id.* Since 1988, the number of undocumented Mexican immigrants in the United States has grown an estimated 150,000 annually. *Id.* Of the 5 million estimated undocumented immigrants in the United States in October 1996, an estimated 2.7 million, or 54 percent, came from Mexico. *Id.* About 60 percent of the total population of undocumented immigrants entered the United States surreptitiously across land borders, either between official ports of entry, or assisted by professional "alien smugglers." *Id.* A "very large majority" of these EWI's (entry without inspection) came from Mexico. *Id.*

Of course, these alarming statistics say nothing of the Border Patrol's other important role in protecting the public interest: preventing the smuggling of illegal narcotics across our borders. At the end of 1997, official estimates held that between 5 and 7 tons of illegal drugs are smuggled across our borders every day. *See* 143 CONG. REC. E2272-01 (daily ed. Nov. 9, 1997) (statement of Hon. James A Traficant, Jr.); *see also Border Patrol Will Extend Its Rio Grande Operations*, AUSTIN AMERICAN-STATESMAN, Apr. 4, 1998 (noting that Border Patrol seized 37,652 pounds of marijuana in March 1998, compared with 9,383 pounds seized in March 1997). In fiscal year 1996, the United States Customs Service discovered and seized 2,895 pounds of heroin, 180,946 pounds of cocaine, and 775,225 pounds of marijuana. *U.S. Customs Strategic Plan*, (last visited Apr. 24, 1998) <http://www.customs.ustreas.gov/about/strat>; *Commissioner of the Customs Service: Oversight Hearing with the Customs Service Before the House Committee on Ways and Means Subcommittee on Trade*, 1997 WL 10571632 (May 15, 1997) (statement of Customs Commissioner George Weise) ("In FY 1996, Customs seized or participated in the seizure of a record 1,000,000 pounds of drugs."). According to the Drug Enforcement Agency, the amount of marijuana seized annually rose from approximately 400,000 pounds in 1990 to approximately

**5**

1,000,000 pounds in 1995. *Marijuana - U.S. Seizures*, (last visited Apr. 24, 1998) <http://www.usdoj.gov/dea/drugdata/cp-313.htm>. The Customs Service estimates that the majority of narcotics entering the United States is being smuggled in along the nation's southern tier. *U.S. Customs Strategic Plan* (last visited Apr. 24, 1998) <http://www.customs.ustreas.gov/about/strat>.

In establishing the reasonable suspicion standard for roving Border Patrol investigatory stops, the Supreme Court weighed these public interests against the "modest" interference with individual liberty that results when an officer stops an automobile and questions its occupants, *Brignoni-Ponce*, 422 U.S. 878-880; however, we recognize that this balancing test is not itself a factor in the individual application of the reasonable suspicion standard to particular cases. Nevertheless, a restatement of the public interests in this regard is useful in that it reminds us to avoid the temptation to be overzealous in our application of this standard in favor of the private, rather than public, interests at stake. *See id.* at 881 ("[B]ecause of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion."). In addition, the current reality of alien and drug smuggling is relevant to the reasonable suspicion analysis because it forms the backdrop against which Border Patrol agents must evaluate the facts and circumstances of each case.

Without question, the Fourth Amendment's protection against unreasonable searches and seizures preserves one of our most cherished rights. In 1975, in *Brignoni-Ponce,* the Supreme Court delineated the scope of that right with regard to investigatory stops by roving Border Patrol agents. *See id.* at 880-86. We are, of course, bound by Supreme Court precedent on the matter, but our reassessment, in light of current events, of the competing interests at stake in the determination of reasonable suspicion bolsters the continued vitality of the Supreme Court's

**6**

mandate in *Brignoni-Ponce*.

C.      *Application of Brignoni-Ponce in the Fifth Circuit*

Clearly, a delicate balance is at stake here. Roving Border Patrol stops implicate important constitutional considerations, which we must balance against some of the nation's most pressing public concerns. We have carefully applied the *Brignoni-Ponce* standard in this circuit in the past, and two recent cases seem particularly on point in light of the circumstances presented by the facts of the present case.

In *United States v. Cardona*, we found that the Border Patrol had the reasonable suspicion necessary to justify an investigatory stop near the Mexican border. 955 F.2d 976 (5th Cir.), *reh'g denied*, 961 F.2d 215 (5th Cir.), *cert. denied*, 506 U.S. 942 (1992). In *Cardona*, two border patrol agents were parked in a marked Border Patrol vehicle at an intersection along a remote south Texas road, which the agents knew to be used primarily by ranchers and hunters traveling in jeeps and trucks. That particular road was a notorious smuggling route on which one of the agents had personally made six stops out of his total of 50 stops during three and one half years with the Border Patrol. *Id.* After about three hours, the agents observed a four door passenger vehicle riding low to the ground. *Id.* After the agents began to follow the vehicle, it slowed its speed considerably and began to weave in the road, crossing the center line several times, which indicated to the agents that "the driver was aware he was being followed and was watching closely in his rearview mirror." *Id.* The agents also observed a small decal covering the place where the vehicle's trunk lock would normally be, which, based on the agents experience, suggested that someone may have removed the lock in order to provide air to undocumented immigrants hiding in the trunk, or to prevent access to the trunk. *Id.* The agents pulled the vehicle over for an investigatory stop, incident to which they ultimately discovered 121 pounds of marijuana in the trunk. *Id.*

Applying the Supreme Court's *Brignoni-Ponce* standard to the totality of the circumstances in *Cardona*, we found that the facts were sufficient to permit the district court to

conclude the agents had a reasonable suspicion that the vehicle was engaged in illegal activity. *Id.*

at 981. We summarized the facts justifying the stop as follows:

> The vehicle was reasonably suspected of coming from the border, it was riding considerably low to the ground despite the fact that only two persons were visible inside it, it slowed considerably and began weaving when followed, and, significantly, it had a decal placed over the position of the trunk lock indicating the possible removal of the lock to permit the free flow of air to persons concealed in the trunk. Moreover, the agents were experienced and the area was known to the agents as an area of high criminal activity of the sort they suspected the vehicle to be engaged in.

*Id.*

In *United States v. Inocencio*, we once again found that the Border Patrol had the requisite reasonable suspicion necessary to conduct an investigatory stop. 40 F.3d 716 (5th Cir. 1994). In *Inocencio*, Border Patrol agents at a checkpoint just south of Hebbronville, Texas, received notice that a vehicle had activated directional vehicular senors on a nearby private ranch road. *Id.* at 719. The Border Patrol had installed these sensors after numerous complaints from ranchers, to detect narcotics smugglers who commonly used the road to circumvent two nearby Border Patrol checkpoints. *Id.* As the agents proceeded to the ranch, they were informed of another sensor "hit," and also heard on their police scanner that a tan Ford Bronco had been making U-turns in the area and driving up and down the highway, which the officers considered to be possible "lead car" or "lookout car" activity. *Id.* at 720.

The agents were parked near a locked gate that enclosed the private ranch when a Ford pickup truck drove up to the inside of the gate. *Id.* The truck's sole occupant got out and unlocked the gate. *Id.* Two other agents drove by as the driver locked the gate after exiting the ranch, and then drove his truck out onto the highway. *Id.* A ranch owner had previously advised the agents that the only vehicles authorized to use the ranch road belonged to ranch employees, with whom the agents were already familiar, employees of a certain oil company, whose trucks the agents knew to bear company logos, and employees of a service company that, as the agents knew, only owned one Datsun truck. *Id.*

Despite their advance knowledge of what vehicles were authorized to use the road, none

of the agents recognized the driver or the truck, which bore no company logo.  *Id.*  In addition, the agents were unaware of any oil activity in the area at that time and noticed that the truck carried no tools or pipe racks typical of oil field trucks.  *Id.*  Finally, the agents found it curious that, although the driver appeared to be dressed as a workman, his clothing appeared too clean for him to have been working in the field.  *Id.*  Based on the foregoing observations, the agents pulled the truck over, which ultimately led to the discovery of approximately 300 pounds of cocaine in a false compartment in the bed of the truck.  *Id.*

Although we found that the "vital element" of proximity to the border was not present in *Inocencio*, we nevertheless concluded that "[t]he totality of . . . circumstances created a sufficient level of reasonable suspicion to conduct an investigatory stop."  *Id.* at 723.  We found clear evidence in the record of several of the factors identified in *Brignoni-Ponce*, including the agents' experience with the area and with seizures on the particular road in question, and that road's reputation as a popular smuggling route (which circumvented two Border Patrol checkpoints).  *Id.*  Also, although the sensor "hits" did not alone generate reasonable suspicion, when combined with the observation of an unfamiliar and atypical-looking oil field vehicle with no company logos and an unfamiliar individual wearing clean workman's clothes, we found the circumstances sufficient to "as a whole, justify such a stop."  *Id.*  We considered that the agents were aware of the suspicious activity of the Ford Bronco in the area, which was consistent with a common smuggling practice of having a "lead car" act as a lookout for the "load car," which would communicate with the lead car via two way radio.  *Id.*  In finding these circumstances, as a whole, sufficient to justify an investigatory stop under *Brignoni-Ponce*, we emphasized that the absence of any factor, even the vital factor of proximity to the border, is not dispositive as long as other articulable facts warrant reasonable suspicion.  *Id.* at 722-723 (noting, however, that where factor of proximity to border is missing, the Court will examine the remaining factors charily).

## II.     Facts of the Present Case

On November 14, 1996, at approximately 5:30 a.m., U.S. Border Patrol Agents Arnoldo

Diaz and Elma Reyna were parked in a marked car under a street light along F.M. 649 at the intersection of Highway 16, about 30 miles north of the Mexican border in Texas. According to the agents, this area was notorious for smuggling activities, although the Border Patrol had not patrolled it for the previous six months, due to manpower shortages.

A white utility vehicle driving north on F.M. 649, from the direction of the border and several border towns, stopped at the intersection directly in front of the agents' vehicle. The utility vehicle contained a tool compartment large enough for a person to fit inside, similar to other compartments in which Agent Diaz had discovered and arrested illegal aliens in the past. The agents, whose Border Patrol vehicle was already in plain view, turned their headlights on the vehicle, but Nichols, the driver, stared straight ahead and did not look at them or in the direction that he eventually turned. Instead, Nichols merely continued to stare straight ahead, into the brush, without looking down the road either to the left or the right.

At the hearing on Nichols' motion to suppress, Agent Diaz testified that, although utility vehicles were not unusual in the area, this vehicle looked suspicious because it was unusually clean and did not appear to have been driven off the road at a ranch or job site, did not bear any company logos (although it did have a "How's My Driving" sticker with an "800 number," which indicated that it was a commercial vehicle), and was on the road about half an hour before such vehicles generally appeared. Although Agent Diaz later testified that the time of the vehicle's appearance, by itself, did not raise his suspicions, there was almost no traffic at the time, as the utility truck was only the third vehicle that the agents had seen in 45 minutes.

The vehicle remained stationary at the intersection for approximately 25 seconds before turning left onto Highway 16. As stated, the driver stared straight ahead during this time, without looking at the Border Patrol vehicle or down the road in either direction. As the vehicle turned, its right rear tires ran off the road. The agents followed the vehicle, which was moving very slowly, and again observed that one of its right rear tires left the road. Agent Diaz testified that he thought this indicated that the driver was more concerned with whether the agents were

**10**

following him than he was with the road ahead.

A radio check of the vehicle's license plates indicated that the utility vehicle was registered to Fleet Leasing Company in Houston. After following the vehicle for approximately 3/4 of a mile, the agents stopped Nichols for an immigration check. Nichols was driving the vehicle and remained inside as Agent Diaz approached him on the driver's side. Agent Diaz testified that the agents stopped Nichols because it seemed like "some kind of illegal activity or something" was occurring. Agent Diaz also testified that, as he approached, he detected the odor of marijuana coming from the tool box area in the back of the truck.

## III. Discussion

The Fifth Circuit reviews determinations of questions of law, such as whether reasonable suspicion existed to stop a vehicle, under the *de novo* standard. *Ornelas v. United States*, 116 S. Ct. 1657, 1663 (1996); *Inocencio*, 40 F.3d at 721. In this context, the Fifth Circuit reviews findings of fact for clear error. *Ornelas*, 116 S. Ct. at 1663; *Inocencio*, 40 F.3d at 721. Furthermore, the Fifth Circuit views the evidence presented at a hearing on a motion to suppress in the light most favorable to the prevailing party. *Inocencio*, 40 F.3d at 721.

### A.      *The Scope of Roving Border Patrol Authority for Investigatory Stops*

As discussed above, except at the border and its functional equivalents, Border Patrol agents on roving patrol may stop vehicles if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle contains illegal aliens or drugs. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). Pursuant to § 287(a)(1) of the Immigration and Nationality Act, the Border Patrol has "power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States . . . ." 8 U.S.C. § 1357(a)(1) (1998). Section 287 also authorizes the Border Patrol, without a warrant, "within a reasonable distance from any external boundary of the United States, to board and search for aliens any . . . vehicle . . . for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." 8 U.S.C. §

**11**

1357(a)(3) (1998). *Brignoni-Ponce* held that this statutory authority is subject to the reasonableness requirement mandated by the Fourth Amendment. 422 U.S. at 882. In *United States v. Cortez*, the Supreme Court clarified that the agents' suspicion need not be confined to considerations of smuggling undocumented immigrants. 449 U.S. 411, 421-22 (1981). Instead, as the Court explained, "the question is whether, based upon the whole picture, they, as experienced Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity." *Id.*

In making a determination of reasonable suspicion, the agents (and the courts reviewing the agents' actions) must take the totality of the circumstances into account. *Cortez*, 449 U.S. at 417. In making determinations of reasonable suspicion in this context, a court may consider several factors:

> (1) known characteristics of a particular area, (2) previous experience of the arresting agents with criminal activity, (3) proximity of the area to the border, (4) usual traffic patterns of that road, (5) information about recent illegal trafficking in aliens or narcotics in the area, (6) the behavior of the vehicle's driver, (7) the appearance of the vehicle, and (8) the number, appearance and behavior of the passengers.

*Inocencio*, 40 F.3d at 722 (quoting *United States v. Casteneda*, 951 F.2d 44, 47 (5th Cir. 1992) (listing factors identified in *Brignoni-Ponce*, 422 U.S. at 884-85)). Under this test, "'reason to believe that the vehicle had come from the border' is a vital element," although "the belief that the vehicle has crossed the border is not necessary if other factors constitute reasonable suspicion to stop the vehicle." *United States v. Pallares-Pallares*, 784 F.2d 1231, 1233 (5th Cir. 1986). Nevertheless, where the agents do not have reason to believe that the vehicle has come from the border, "the remaining factors must be examined charily." *Id.*

**B.**     ***The Totality of the Circumstances in this Case Gave Rise to a Reasonable Suspicion that Nichols was Engaged in Criminal Activity***

Our review of the record clearly demonstrates that the totality of the circumstances the Border Patrol agents identified were clearly sufficient to satisfy the reasonable suspicion standard, particularly when viewed in the light most favorable to the prevailing party on the motion to dismiss, as our precedent requires. *See Inocencio*, 40 F.3d at 721 ("The evidence presented at a

pre-trial hearing on a motion to suppress is viewed in the light most favorable to the prevailing party."). The agents testified: that the road in question was notorious as a popular smuggling route; that Agent Diaz had previously made arrests where he had found illegal aliens concealed in toolboxes such as the one on Nichols' truck; that Nichols was traveling north from the border area and that there was no development other than ranches within twenty miles of that intersection; that, based on their experience, Nichols' truck was uncharacteristically clean for a utility vehicle coming from a ranch in that area; that Nichols had stopped for 25 seconds at the stop sign, without looking in either direction down the road; that, during that 25 seconds, Nichols did not look at the Border Patrol agents when they shined their headlights on Nichols' truck; that Nichols' truck bore no company logo, which was also uncharacteristic of utility vehicles in that area; that Nichols was on the road about a half hour earlier than utility vehicles normally appeared in that area (although Agent Diaz admitted that this factor was borderline); that traffic at that time was very light, with Nichols' vehicle representing only the third vehicle in 45 minutes; that when Nichols finally did make the turn he was traveling at an unusually slow speed, and; that Nichols swerved off the road twice while the agents were behind him.

When viewed in the aggregate, these factors amount to a reasonable suspicion that Nichols was engaged in illegal activity. Although some of these factors would not alone amount to reasonable suspicion, reasonable suspicion determinations are not limited to analysis of any one factor. *Inocencio*, 40 F.3d at 722; *see also Cortez*, 449 U.S. at 417 ("[T]he totality of the circumstances -- the whole picture -- must be taken into account."). Furthermore, under a totality of the circumstances analysis, the absence of a particular factor will not control a court's conclusions. *Cardona*, 955 F.2d at 980. The totality of the circumstances presented by the factors in this case becomes even more convincing in light of our standard of review: we must view the evidence presented at the hearing on the motion to suppress in the light most favorable to the prevailing party -- in this case, the government. *See Inocencio*, 40 F.3d at 721; *Cardona*, 955 F.2d at 977.

**13**

### 1. *Nichols' proximity to the border supports reasonable suspicion*

The district court properly found that the location of the stop in this case was "relatively close to the Mexican border." This Court has noted that "[w]e have at times focused our inquiry initially on the question of whether arresting agents could reasonably conclude a particular vehicle originated its journey at the border." *Id.* at 980. As stated, where the agents do not have reason to believe that the vehicle has come from the border, the remaining reasonable suspicion factors must be examined "charily." *Pallares-Pallares*, 784 F.2d at 1233. Consideration solely of distance may show that a vehicle is not likely to have come from the border. *See Inocencio*, 40 F.3d at 722 n.7 (noting that "[v]ehicles traveling more than fifty miles from the border are usually a 'substantial' distance from the border"); *United States v. Melendez-Gonzalez*, 727 F.2d 407, 411 (5th Cir. 1984) ("When the stop occurs a substantial distance from the border, we have found this element missing."). When finding that a vehicle did come from the border, however, the court should consider additional factors. *See Inocencio*, 40 F.3d at 722 n.6 (noting that "this issue is resolved by an analysis of the road the vehicle was traveling on, the number of towns along the road, the number of intersecting roads and, finally, the number of miles the vehicle was actually from the border at the point of the stop").

In *Cardona*, under circumstances similar to this case, this Court held that Border Patrol agents had a "reasonable suspicion to conclude the vehicle had originated its journey at the border." 955 F.2d at 980. In *Cardona*, the vehicle, a mid-size passenger car, was between 40 and 50 miles from the border and was uncharacteristic of normal traffic for that road, which consisted mainly of ranch trucks and hunting jeeps. *Id.* Finally, the vehicle in *Cardona* was traveling in an easterly direction, and the towns serviced by the western direction of the road were all on or very near the border. *Id.*

In light of *Cardona*, and common sense, the Border Patrol agents in this case clearly had reason to believe that Nichols was coming from the border. Nichols was only about 30 miles from the border, while *Cardona*, and other cases have considered proximity to the border to be a

factor contributing to reasonable suspicion when the stop occurred up to 50 miles from the border.  *See id.*; *see also Inocencio*, 40 F.3d at 722 n.7.  Here, the agents testified that the only development within 20 miles of the intersection consisted of ranches which, due to the agents' past experience, the cleanliness of Nichols' vehicle, and the lack of a company logo, the officers considered unlikely points of origin for Nichols' truck.  In other words, here, as in *Cardona*, the agents reasonably noticed that the vehicle in question was uncharacteristic of normal traffic for the particular road involved.

Furthermore, as in *Cardona*, the existence of some towns between the border and the intersection at issue does not defeat a determination of reasonable suspicion.  In *Cardona*, we engaged in the following analysis:

> Here, the vehicle was between 40 and 50 miles from the border.  The road is a rural, two-lane highway with approximately 90% of its traffic consisting of ranch trucks and hunting jeeps.  The vehicle, a mid-size passenger car, was traveling in an easterly direction, and *the towns serviced by the western direction of the road are all on or very near the border.*  We hold that under these facts the agents had a reasonable suspicion to conclude the vehicle had originated its journey at the border.

*Cardona,* 955 F.2d at 980 (emphasis added).  At the suppression hearing in this case, Judge Kazen, one of our most able trial judges, specifically pointed out, in relation to the Border Patrol agent's testimony:

> *If you look at the map and the familiarity that we all have with that area*, I mean, we're taking about a kind of nowhere land.  *649 really comes from nowhere in particular*.  It's just a little ranch road that . . . a south Texas ranch road that, generally, a Houston utility vehicle, at 5:00 o'clock in the morning, has noting to do there at all unless it's . . . unless it's the typical type of vehicle that is there . . . stationed there from these oil companies, working the ranches there, and I take it what the gentleman is saying is that those trucks they know because they generally have all of their logos and insignias about what oil company they are and what they're doing there.  So here comes a whistle clean, white Houston utility truck at five something in the morning, coming north on *649, which is, as I say, coming essentially from nowhere and going essentially nowhere*, and then has this sort of odd conduct at the intersection.

(emphasis added).  Later in the hearing, while admitting the Border Patrol agent's hand-drawn diagram of the area in question, Judge Kazen continued:

> For the record, I always keep it here on the bench, 'cause I've done some [*sic*] many of these.  I keep a state map of this whole area . . . and, you know, a map is a map and you sort of take judicial notice of what all those intersections are.

As the Supreme Court recently pointed out, in *Ornelas v. United States*:

> [A]s a general matter determinations of reasonable suspicion should be reviewed *de novo* on appeal.  Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.

116 S. Ct. 1657, 1663 (1996).

In light of this standard, our holding in *Cardona*, and Judge Kazen's noted consideration of his own knowledge of the area and the Border Patrol agent's experience, as well as his consultation of a map of south Texas, we find that Judge Kazen did not err by finding that the factor of proximity to the border contributed to reasonableness of the Border Patrol agents' suspicion.  Although a reasonable conclusion of proximity to the border does not alone constitute reasonable suspicion for a Border Patrol stop that is not at the border or its functional equivalent, this "vital element" contributes significantly to the reasonableness of the Border Patrol agents' suspicion.  *See Pallares-Pallares*, 784 F.2d at 1233 (holding that, where agents do not have reason to believe that vehicle came from border, "the remaining factors must be examined charily"); *see also, e.g., Inocencio*, 40 F.3d at 722 n.6 ("This Court considers the fact that a vehicle may have recently crossed the border as a vital element in making an investigatory stop."); *Cardona*, 955 F.2d at 980 ("We have at times focused our inquiry initially on the question of whether arresting agents could reasonably conclude a particular vehicle originated its journey at the border."); *United States v. Pacheco*, 617 F.2d 84, 86 (5th Cir. 1980) (finding no reasonable suspicion where "it was pure speculation on part of agents to opine that defendant's journey originated at border").

## 2.      *Nichols' behavior supports reasonable suspicion*

Nichols accurately points to Fifth Circuit precedent holding that avoidance of eye contact is entitled to no weight, *see United States v. Chaves-Villarreal*, 3 F.3d 124, 127 (5th. Cir. 1993); *Cardona*, 955 F.2d at 983 n.9; however, the record reflects that the Border Patrol agents were more concerned with Nichols' overall *behavior* at the stop sign than they were with his eye contact, or lack thereof.  It is beyond dispute that Border Patrol agents may consider the behavior

**16**

of a vehicle's driver in determining whether there is reasonable suspicion to stop that vehicle. *See*, *e.g.*, *Brignoni-Ponce*, 422 U.S. at 885 ("The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion."); *Inocencio*, 40 F.3d at 723 (defendant's use of "load car - lead car" driving pattern, commonly used by drug smugglers, contributed to reasonableness of Border Patrol agents' suspicion); *Cardona*, 955 F.2d at 981 (considering, in reasonable suspicion analysis, that vehicle slowed its speed considerably and began weaving shortly after agents began following it).

Here, Nichols' behavior at the stop sign obviously adds to the reasonableness of the Border Patrol agents' suspicion. Nichols stopped at the intersection for a full twenty to thirty seconds. The Border Patrol vehicle was in plain view less than 15 feet away from Nichols' vehicle. A street light initially illuminated the Border Patrol vehicle, and the agents illuminated Nichols' truck with their headlights as Nichols approached the intersection. The Border patrol agents observed that, not only did Nichols avoid making eye contact, but he also did not even look in their direction when they illuminated their headlights, nor did he look in either direction down the road as if to see which way to go. Instead, Nichols simply stared straight ahead into the brush.

Agent Diaz's testimony makes it clear that it was not merely Nichols' avoidance of eye contact that contributed to the agents' suspicions, but his overall behavior while at the stop sign for an unusual period of time:

Q.   What did this person do when you illuminated the cab with your headlights?

A.   Well, he didn't acknowledge us at all. I mean, that seemed kind of strange.

Q.   What do you mean by "he didn't acknowledge you"?

A.   He came up to the stop sign and just . . . it seemed like he parked there, you know, maybe twenty or thirty seconds and just kept staring forward, which there's nothing but brush. He never turned to see which way he was going to turn to or head to.

* * *

Q.   Okay. And during that entire thirty second period, twenty or thirty second period,

**17**

whatever you said, his head did not move in any direction?

A.     No.

Q.     Did the . . . well, let me back up a little bit.  You described . . . and we're talking about this utility vehicle.  At this point in time, after you're shining your headlights on, and it's got no logos and it's clean, is there anything about the truck itself that causes you to believe that something illegal is going on?  Or could be going on?

A.     Well, other than it not having any logos and everything and this vehicle seemed real clean and Mr. Nichols there never acknowledging our presence . . . I mean, we had our headlights on, which at 5:30 in the morning, a normal person is probably . . . I would turn and see who's there, and the subject never did it.  So it just made us more suspicious about what he was doing.

In addition to Nichols' behavior while at the stop sign, Nichols' behavior once he made the turn also contributes to the reasonableness of the Border Patrol agents' suspicion.  Nichols was driving unusually slow and swerved off the road twice while the Border Patrol agents were following him.  This Court gave significance to almost identical circumstances in the reasonable suspicion analysis in *Cardona*, where the Border Patrol agent testified that this behavior indicated that the driver was watching the agents in his rearview mirror.  955 F.2d at 981.  In the present case, Agent Diaz' testimony on this point is particularly illustrative:

Q.     Did the vehicle do anything . . . after you began to follow it and checked the registration, did the vehicle do anything else that raised your suspicion?

A.     Well, as soon as he made the left-hand turn, as he was making his turn, his rear, I guess, dual tire or whatever . . . the rear tire on the passenger side went off the road.  So he went off the road for a second and got back on.

Q.     Okay.  You said he ran off the road.  He ran onto the gravel?

A.     Into the gravel, right, off the pavement.

Q.     Okay.  Did he stay on the gravel or did the vehicle continue forward?

A.     It continued forward.  He was driving at a slow rate of speed.  So he just got back on the road and continued on.

* * *

Q.     How slow would you say he was going?

A.     Pretty slow.  I don't know.  Maybe thirty miles an hour.  Maybe not even such.  It was real slow.

**18**

Q.   And how far behind him were you?

A.   Well, we just got up close enough to get the vehicle license plates and we pulled back maybe three car lengths, two or three car lengths behind him.

Q.   Okay.  After the vehicle ran onto the gravel this first time, did it do anything after that that was unusual to you?

A.   Well, he continued on and he kept going real slow, and for a second time, he went off the side, but it wasn't as drastic as the first time.  He just kind of pull [*sic*] off and on.  Or on and off, I should say.

Q.   So again he swerved off and then got back on?

A.   Right.  Slightly.

Q.   What, if anything, did that indicated [*sic*] to you?

A.   It appeared to me that he was more worried about us following him than the road ahead of him.

Here, as in *Cardona*, it was reasonable for the officers to conclude that Nichols' apparent concern with the agents behind him rather than the road ahead of him was indicative of some sort of criminal activity.  This is particularly true in light of Nichols' suspicious behavior at the stop sign.  As such, consideration of the factor of the driver's behavior weighs in favor of reasonable suspicion.

3.   *The characteristics of the area, the road, and the truck, and information about recent smuggling in the area all support reasonable suspicion*

Consideration of the factors of the characteristics of the area, the usual traffic patterns of the road, the information about recent illegal trafficking in aliens or narcotics in the area, and the appearance of Nichols' truck also weighs in favor of reasonable suspicion.  Agent Diaz testified that during his approximate four years and six months as a Border Patrol agent, he primarily patrolled a 40 square mile area around Hebbronville, which includes the intersection and roads at issue in this case.  Agent Diaz testified as follows:

Q.   Why did you proceed to this particular intersection?  Is there anything significant about this intersection?

A.   Well, it's become pretty notorious for a route that people can circumvent the checkpoint on highway 16.  So we've been sending units down here to see that . . .

**19**

watch the traffic and observe it there for a while.

\* \* \*

Q.    Okay.  Was [Nichols'] direction of travel consistent after he made the turn?  Was his direction of travel consistent with that of one circumventing a checkpoint?

A.    Yes, ma'am.

Q.    Which checkpoint would that have been?

A.    The one on highway 16, in Hebbronville.

Q.    Was that significant to you?

A.    Yes, ma'am.

It is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion.  *See, e.g., Inocencio*, 40 F.3d at 723 ("It was certainly clear to Agent Rhodes and the other agents that this road . . . was a main artery for drug smuggling since it circumvented the two Border Patrol checkpoints."); *United States v. Ramirez-Lujan*, 976 F.2d 930, 933-34 (5th Cir. 1992) (giving weight to notoriety of the road's use for illegal activity and to avoid checkpoint).  Although Agent Diaz also testified that the Border Patrol had not investigated the particular area surrounding the intersection at issue for approximately six months prior to Nichols' arrest, he explained that this was due to a shortage of manpower.  As such, that fact alone does not diminish the significance of the road's reputation as a smuggling route.

The usual traffic patterns of the road, combined with the relatively uncommon appearance of Nichols' vehicle further supports a finding of reasonable suspicion.  Initially, Agent Diaz noted that the vehicle's appearance alone contributed to their suspicion:

Q.    When it passed your location, was there anything in particular that . . . as it approached you, was there anything in particular about it that you noticed?

A.    We found it odd that the truck seemed fairly . . . extremely clean and it didn't have any logos or markings on it at all.

Agent Diaz elaborated by explaining that it was uncommon for a utility truck *in that area* to be as clean as Nichols' truck was:

**20**

Q.    Okay. And when you observed this vehicle, you also said that it was clean. Why did that strike you as unusual?

A.    'Cause most of the utility trucks in that area are . . . . They're always going into job sites. They're either going into ranches or to rigs or whatever and they're always dirty.

Agent Diaz continued by noting that utility trucks were common *in the area*, but that utility trucks bearing no logos were uncommon:

Q.    Okay. Now, when you saw this clean utility vehicle with no logos at 5:30 in the morning, at the intersection of 16 and 649, what occurred to you? What did you think was going on?

A.    It just seemed out of the ordinary for that area. I mean, we get a lot of trans-Texas or whatever utility trucks there and they all have their logos and there's numbers on the fenders or . . . you know, something to indicate who they're from and we had only had two vehicles prior to that and they weren't anything like utility trucks.

In addition, Agent Diaz testified about other aspects of the truck's appearance that raised his suspicions:

Q.    Did the white utility truck have, I guess, anything like tool boxes or . . . utility vehicles normally have things to place tools or equipment or something. Did this vehicle have that on it?

A.    Yes, it did. The whole truck itself -- or the back portion of the truck is a tool box, a big tool box, which is pretty big, according to the picture there. A person could easily fit in the tool box compartment itself.

Q.    Okay. Was that important to you as you were looking at this vehicle and the behavior of the driver?

A.    Yes, ma'am.

Q.    Okay. Have you ever made arrests of individuals that have been in tool boxes or hiding in tool boxes?

A.    Yes, ma'am.

This Court has in the past given weight to an agent's observation that a vehicle's appearance was atypical of vehicles in the particular area in question. *See Inocencio*, 40 F.3d at 723 (giving weight, in totality of circumstances, to observation of unfamiliar and atypical-looking oil field vehicle with no company logos). In this case, the vehicle's appearance, especially when combined with the known characteristics of the area and the particular road, also contributes to the

**21**

reasonableness of the agents' suspicion.

**4.** ***The previous experience of the agents supports reasonable suspicion***

As is evident from the discussion of the preceding factors, the previous experience of Agents Diaz and Reyna contributes to the reasonableness of their suspicion in this case. To begin with, Agent Diaz testified that he had personal experience making arrests for alien smuggling in the area of Nichols' arrest. Specifically, Agent Diaz testified that he had made "at least ten, if not more" arrests in that area. Furthermore, as stated, Agent Diaz had personally made arrests of individuals hiding in tool boxes in the back of trucks similar to the ones on the back of Nichols' truck. In addition, as discussed above, the agents past experience with the area informed their consideration of the factors of proximity to the border, the characteristics of the area, the usual traffic patterns of the road, and information about recent illegal trafficking in aliens or narcotics in the area. The agents' previous experience with the road and the surrounding area also contributes to the reasonableness of their suspicion arising from the vehicle's appearance, *to wit*, extreme cleanliness and the lack of a logo, which was uncharacteristic of utility vehicles in the area.

The interplay of the agents' past experience demonstrates the importance of viewing the factors in light of the totality of the circumstances. *See Brignoni-Ponce*, 422 U.S. at 885 ("In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling."); *United States v. Casteneda*, 951 F.2d 44, 47 (5th Cir. 1992) (holding that agent's previous experience with criminal traffic and behavior of vehicle's driver are factors to consider with regard to reasonable suspicion). In *Casteneda*, we stated that "[r]easonable suspicion takes its fact-driven meaning from the totality of the circumstances known to the agent, and the agent's experience in evaluating such circumstances." 951 F.2d at 47. As such, although there is nothing inherently suspicious about a clean white truck with no corporate logo, suspicion is reasonable where that truck is less than 30 miles from the Mexican-American border, on a road where such trucks usually are dirty due to ranch work and usually do have logos, about a half an hour before such trucks normally are on the road, observed by two border patrol agents who have

22

previously arrested illegal aliens hiding in the tool compartments of similar trucks, who know the characteristics of the area, and know that the road in question is a notorious smuggling route because it circumvents a Border Patrol checkpoint.[2]

### C.     *The Role of Precedent*

In the totality of the circumstances analysis, each case necessarily must turn on its own facts; however, analysis of precedent is necessary to glean the proper rule of law when giving consideration to the individual factors that make up the relevant totality of circumstances.  For example, our cases establish that avoidance of eye contact is entitled to no weight in the determination of reasonable suspicion.  *See Chaves-Villarreal*, 3 F.3d at 127; *Cardona*, 955 F.2d at 983 n.9.  As such, we did not consider avoidance of eye contact to be a factor contributing to the reasonableness of the agents' suspicion in this case.  In contrast, we are also confronted with binding precedent establishing that the behavior of a vehicle's occupants and driver are factors that may support a determination of reasonable suspicion.  *Brignoni-Ponce*, 422 U.S. at 885; *Inocencio*, 40 F.3d at 723; *Cardona*, 955 F.2d at 981.  Accordingly, we look to our precedent to guide us in our determination of whether the circumstances weigh for or against a finding of reasonable suspicion.

This is not to say that any particular case has dictated our decision today.  Although we draw support from the similarity of certain cases to the facts presently before us, such as *Inocencio* and *Cardona*, we do not consider those cases to dictate our decision.  Rather, the totality of facts and circumstances presented in the record have dictated our result in this case.  Our precedent does inform our analysis, however, by illustrating the relative significance of certain facts and circumstances.

Just as *Inocencio* and *Cardona* are similar to the present case, so have we come across

---

[2]  Although Judge Kazen did find that unusual cleanliness of a white truck, cleanliness of the driver's clothing, and the driver's failure to make eye contact did not indicate criminal activity in *United States v. Meza-Diaz*, 881 F. Supp. 263 (S.D. Tex. 1994), that case does not preclude his consideration of those factors in subsequent cases involving different circumstances.

several readily distinguishable cases finding no reasonable suspicion. For example, in *United States v. Orona-Sanchez*, we found no basis for reasonable suspicion where the Border Patrol agents were new to the area and the agents had no idea where the vehicle was coming from. 648 F.2d 1039, 1041-42 (5th Cir. 1981). In contrast, in the present case, Agents Diaz and Reyna had extensive experience patrolling the area where they stopped Nichols and, based on that experience, they suspected that Nichols was coming from the border. Similarly, in *United States v. Lopez*, in finding that no reasonable suspicion existed, it was significant that avoidance of eye contact is entitled to no weight and that the agents did not have reason to believe the defendant's vehicle was coming from the border. 564 F.2d 710, 712-13 (5th Cir. 1977) (noting that belief that vehicle came form border is "vital" element in *Brignoni-Ponce* analysis and that government placed "heavy reliance on appellant's failure to make eye contact with the agents"). As such, these cases do not detract from our finding of reasonable suspicion in the present case.

Another distinguishable case is *United States v. George*, where we found no reasonable suspicion for a stop that occurred close to the border at 1:45 a.m., where the vehicle was "larger than a compact" and had out of state license plates, the agents did not recognize the driver or the car, and the agents' did not observe any camping gear in the vehicle. 567 F.2d 643, 644-46 (5th Cir.), *reh'g denied*, 573 F.2d 85 (5th Cir. 1978). An important factor affecting the totality of the circumstances in *George* was that the stop occurred close to a national park. *Id.* As a result, *George* presented a situation similar to what the Supreme Court specifically sought to avoid by formulating the reasonable suspicion standard in *Brignoni-Ponce:*

> To approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers.

*Brignoni-Ponce*, 422 U.S. at 882. Similarly, sanctioning the stop in *George* would have meant that all out of state visitors to the nearby national park (which, at the time, attracted more than 300,000 visitors per year) would be subject to random interference with their Fourth Amendment rights simply by virtue of being on the road late at night. 567 F.2d at 645. In the present case,

**24**

however, as noted above, we are dealing with what Judge Kazen described as "a kind of nowhere land." This fact, in contrast to the presence of a nearby national park, contributes significantly to the reasonableness of the Border Patrol agents' suspicion, particularly in light of their experience with the area and the normal types and patterns of traffic in that area. As such, *George* and similar cases do not detract from our finding of reasonable suspicion in this case.

The bottom line is that we must make reasonable suspicion determinations on a case by case basis, considering the totality of the circumstances of each particular case as they appeared to the officers or agents at the time of the stop. Nonetheless, we are guided by past applications of the standard. Here, as illustrated above, our review of precedent supports our finding that the totality of the circumstances presented sufficiently articulable facts for the agents to reasonably suspect that Nichols was engaged in illegal activity.

## Conclusion

Judge Kazen correctly applied the reasonable suspicion standard in finding the totality of the circumstances sufficient to justify the stop in this case. This is particularly true due to the requirement that we view the evidence in the light most favorable to the government, as the party that prevailed on the motion to suppress. This finding is consistent with Supreme Court and Fifth Circuit precedent and the important policies underlying the cases in this area. As such, we hereby AFFIRM the district court's order denying Nichols' motion to suppress.

AFFIRMED.

ENDRECORD

DENNIS, Circuit Judge, dissenting:

I respectfully dissent. "In the context of border area stops, the reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government." *United States v. Brignoni-Ponce,* 422 U.S. 873, 882 (1975). "Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884. Despite the mastery displayed by the majority opinion, I do not believe that the officers in the present case were able to point to specific articulable facts which, taken together with rational inferences therefrom, reasonably justified a suspicion that Nichols's vehicle contained aliens illegally in the country or was engaged in other criminal activity. The probative significance of the combined enumerated factors relied upon by the officers was negligible; because the vehicle stop here was based almost completely on the officers' subjective determinations, it crossed the line beyond which the stopping of automobiles upon "reasonable suspicion" grounds runs afoul of the Fourth Amendment. *See United States v. Escamilla,* 560 F.2d 1229 (5th Cir. 1977).

ENDRECORD